INTERSTATE COMMERCE COMMISSION *v.* CINCINNATI, NEW ORLEANS AND TEXAS PACIFIC RAILWAY COMPANY.

CERTIFICATE FROM THE COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 733.   Argued March 22, 23, 1897. — Decided May 24, 1897.

Congress has not conferred upon the Interstate Commerce Commission the legislative power of prescribing rates either maximum or minimum or absolute; and, as it did not give the express power to the commission, it did not intend to secure the same result indirectly by empowering that tribunal to determine what in reference to the past was reasonable and just, whether as maximum, minimum or absolute, and then enable it to obtain from the courts a peremptory order that in the future the railroad companies should follow the rates thus determined to have been in the past reasonable and just.

*New Orleans & Texas Pacific Railway* v. *Interstate Commerce Commission*, 162 U. S. 184, affirmed and followed.

THIS case is before us on a question certified by the Court of Appeals for the Sixth Circuit.   On May 29, 1894, the Interstate Commerce Commission entered an order, of which the following is a copy:

"At a general session of the Interstate Commerce Commission, held at its office in Washington, D. C., on the 29th day of May, A.D. 1894.

"Present: Hon. William R. Morrison, chairman; Hon. Wheelock G. Veazey, Hon. Martin A. Knapp, Hon. Judson C. Clements and Hon. James D. Yeomans, commissioners.

"THE FREIGHT BUREAU OF THE CINCINNATI CHAMBER OF COMMERCE

*v.*

THE CINCINNATI, NEW ORLEANS AND TEXAS PACIFIC RAILWAY Company, Lessee of the Cincinnati Southern Railway; The Louisville and Nashville Railroad Company; The East Tennessee, Virginia and Georgia Railway Company; The Western and Atlantic Railroad Company; The Alabama Great Southern Railroad Company; The Atlanta and West Point Railroad Company; The Central Rail-

road and Banking Company of Georgia; The Georgia Railroad Company; The Georgia Pacific Railway Company; The Norfolk and Western Railroad Company; The Port Royal and Augusta Railway Company; The Richmond and Danville Railroad Company; The Savannah, Florida and Western Railway Company; The Seaboard and Roanoke Railroad Company; The South Carolina Railway Company; The Western Railway of Alabama; The Wilmington and Weldon Railroad Company; The Wilmington, Columbia and Augusta Railroad Company; The Baltimore, Chesapeake and Richmond Steamboat Company; The Clyde Steamship Company; The Merchants' and Miners' Transportation Company; The Ocean Steamship Company; The Old Dominion Steamship Company.

"The Chicago Freight Bureau

*v.*

The Louisville, New Albany and Chicago Railway Company; The Chicago and Alton Railroad Company; The Chicago and Eastern Illinois Railroad Company; The Cincinnati, Hamilton and Dayton Railroad Company; The Cleveland, Cincinnati, Chicago and St. Louis Railway Company; The Evansville and Terre Haute Railroad Company; The Illinois Central Railroad Company; The Louisville, Evansville and St. Louis Consolidated Railroad Company; The Peoria, Decatur and Evansville Railway Company; The Pittsburgh, Cincinnati, Chicago and St. Louis Railway Company; The Terre Haute and Indianapolis Railroad Company; The Wabash Railroad Company; The Cincinnati, New Orleans and Texas Pacific Railway Company, Lessee of the Cincinnati Southern Railway; The Louisville and Nashville Railroad Company; The East Tennessee, Virginia and Georgia Railway Company; The Western and Atlantic Railroad Company; The Alabama Great Southern Railroad Company; The Atlanta and West Point Railroad Company; The Central Railroad and Banking Company

of Georgia; The Georgia Railroad Company; The Georgia Pacific Railway Company; The Norfolk and Western Railroad Company; The Port Royal and Augusta Railway Company; The Richmond and Danville Railroad Company; The Savannah, Florida and Western Railway Company; The Seaboard and Roanoke Railroad Company; The South Carolina Railway Company; The Western Railway of Alabama; The Wilmington and Weldon Railroad Company; The Wilmington, Columbia and Augusta Railroad Company; The Baltimore, Chesapeake and Richmond Steamboat Company; The Clyde Steamship Company; The Merchants' and Miners' Transportation Company; The Ocean Steamship Company; The Old Dominion Steamship Company.

"These cases being at issue. upon complaints and answers on file, and having been duly heard and submitted by the parties, and full investigation of the matters and things involved herein having been had, and the commission having on the date hereof made and filed a report and opinion containing its finding of fact and conclusions thereon, which said report and opinion is hereby referred to and made a part of this order, and the commission having, as appears by said report and opinion, found and decided, among other things, that the rates complained of and set forth in said report and opinion as in force over roads operated by carriers defendant herein and forming routes or connecting lines leading southerly from Chicago or Cincinnati to Knoxville, Tenn.; Chattanooga, Tenn.; Rome, Ga.; Atlanta, Ga.; Meridian, Miss.; Birmingham, Ala.; Anniston, Ala., and Selma, Ala., are unreasonable and unjust and in violation of the provisions of the act to regulate commerce:

"It is ordered and adjudged that the above-named defendants and each of them, engaged or participating in the transportation of freight articles enumerated in the Southern Railway and Steamship Association classification as articles of the first, second, third, fourth, fifth or sixth class, do from and after the tenth day of July, 1894, wholly cease and desist and

thenceforth abstain from charging, demanding, collecting or receiving any greater aggregate rate or compensation per hundred pounds for the transportation of freight in any such class from Cincinnati, in the State of Ohio, or from Chicago, in the State of Illinois, to Knoxville, Tenn.; Chattanooga, Tenn.; Rome, Ga.; Atlanta, Ga.; Meridian, Miss.; Birmingham, Ala.; Anniston, Ala., or Selma, Ala., than is below specified in cents per hundred pounds under said numbered classes respectively and set opposite to said points of destination — that is to say :

| On shipments of freight from Cincinnati — | | | | | |
|---|---|---|---|---|---|
| To — | Class 1, rates per 100 lbs. | Class 2, rates per 100 lbs. | Class 3, rates per 100 lbs. | Class 4, rates per 100 lbs. | Class 5, rates per 100 lbs. | Class 6, rates per 100 lbs. |
| | Cents. | Cents. | Cents. | Cents. | Cents. | Cents. |
| Knoxville ..... | 53 | 45 | 37 | 27 | 22 | 20 |
| Chattanooga... | 60 | 54 | 40 | 30 | 24 | 22 |
| Rome ......... | 75 | 64 | 54 | 44 | 34 | 24 |
| Atlanta......... | 86 | 73 | 60 | 45 | 35 | 27 |
| Meridian...... | 114 | 98 | 80 | 62 | 49 | 38 |
| Birmingham... | 87 | 74 | 60 | 46 | 36 | 28 |
| Anniston...... | 86 | 73 | 60 | 45 | 35 | 27 |
| Selma ......... | 108 | 92 | 78 | 60 | 48 | 36 |

| On shipments of freight from Chicago — | | | | | |
|---|---|---|---|---|---|
| To — | Class 1, rates per 100 lbs. | Class 2, rates per 100 lbs. | Class 3, rates per 100 lbs. | Class 4, rates per 100 lbs. | Class 5, rates per 100 lbs. | Class 6, rates per 100 lbs. |
| | Cents. | Cents. | Cents. | Cents. | Cents. | Cents. |
| Knoxville ..... | 93 | 79 | 62 | 44 | 37 | 32 |
| Chattanooga... | 100 | 88 | 65 | 47 | 39 | 34 |
| Rome ......... | 114 | 97 | 79 | 61 | 49 | 38 |
| Atlanta......... | 126 | 107 | 85 | 62 | 50 | 39 |
| Meridian...... | 114 | 98 | 82 | 60 | 47 | 38 |
| Birmingham... | 111 | 95 | 72 | 52 | 44 | 34 |
| Anniston...... | 126 | 107 | 85 | 62 | 50 | 39 |
| Selma......... | 128 | 112 | 89 | 66 | 53 | 38 |

" And said defendants and each of them are also hereby notified and required to further readjust their tariffs of rates and charges so that from and after said 10th day of July, 1894, rates for the transportation of freight articles from Cincinnati and Chicago to southern points other than those hereinabove specified shall be in due and proper relation to rates put into effect by said defendants in compliance with the provisions of this order.

" And it is further ordered, that a notice embodying this order be forthwith sent to each of the defendant corporations, together with a copy of the report and opinion of the commission herein, in conformity with the provisions of the fifteenth section of the act to regulate commerce."

The railroad companies having failed to comply with the order, the Interstate Commerce Commission instituted this suit in the Circuit Court of the United States for the Southern District of Ohio to compel obedience thereto. The court upon a hearing entered a decree dismissing the bill (76 Fed. Rep. 183), from which decree an appeal was taken to the Court of Appeals, and that court, reciting the order, submits to us the following question: " Had the Interstate Commerce Commission jurisdictional power to make the order hereinbefore set forth — all proceedings preceding said order being due and regular, so far as procedure is concerned ? "

*Mr. Harlan Cleveland* for appellant. *Mr. Assistant Attorney General Whitney* filed a brief for same.

*Mr. Edward Baxter* for appellees.

*Mr. George F. Edmunds* closed for appellant.

I. The testimony before the commission completely proved the complainants' case. There was the evidence of several witnesses extensively engaged in various kinds of business, as well as railway gentlemen, showing beyond all fair dispute the unreasonableness in themselves of the rates from Cincinnati and Chicago to southern points, and also the undue pref-

erence given by the established rates to eastern cities and localities. The defendants evidently intended to lie by, as their custom had been, but they did introduce one or two witnesses whose testimony rather tended to support than to rebut the complainants' evidence ; and the written documents of their agreements and proceedings furnish the key to the whole of the concerted tyranny that was established by the Southern Railway and Steamship Association and its allies.

· There is submitted herewith a memorandum of the points of the testimony adduced before the commission and of that adduced in court, including that in the private suit of *Shinkle et al.*, which is in by stipulation, which may be useful as a reference index. A few tables and documents are also collated. The proceedings of the commission are a part of the bill of complaint.

II. As to the powers of the commission :

The United States may institute *direct* proceedings for the enforcement of its provisions *and* for punishment. These are two distinct powers. The ·first is to be exercised on notice and investigation and decision, as in any judicial tribunal ; the second, in causing criminal procedure against offenders.

Suppose in this matter the commission had found on its own inquiry that section 1 had been violated by the failure of the railway to maintain "reasonable" rates, and had instituted direct proceedings in the Circuit Court to compel obedience to the requirements of that section, could not the court have power to decree the observance of the prices it should find to be reasonable ? Or could it only say that the prices exacted must not be continued, and stop there ? Is this at all consistent with the requirements of another section of the act, that the court shall proceed in the enforcement of it as a court of equity, and in such a manner as to do justice ? Such a question furnishes, we submit, its own answer.

III. If the foregoing be true, can it be doubted that the commission, in exercising its duty in the enforcement of section 1, could require the railroad to do the same thing, and if it fail to do it, apply to this court to compel obedience ?

IV. As to the action of the commission in trying the matter, the thirteenth section declares that any person, etc., "complaining of anything done or *omitted* to be done" may apply; whereupon the commission shall notify the carrier and call on him to satisfy the complaint, or answer. It then provides that if the carrier shall make "*reparation*," etc., no further proceedings shall be had. Does not this mean that if the carrier shall have reduced his rates to a reasonable point no further proceeding shall be had? Could it be said that the carrier had made reparation if the extortion were twenty cents a hundred and he only reduced five? Obviously not! It is clear, then, that the reparation required is the whole of that conduct which the word "reparation" principally means, and that short of doing that the proceeding shall go on, and that the commission shall have power to require *all* that the carrier is bound by law and justice to do.

The fourteenth section provides that if such reparation shall not be voluntarily made by the carrier, the commission shall decide and make "recommendation as to *what* reparation, if any, should be made." This is as clear as language can make it, that the commission is to have power to determine *what* the carrier ought affirmatively *to do*, and not merely the power to say what the carrier ought *not* to do.

The fifteenth section provides that in such a case the commission, if anything is found "to have been done or *omitted* to be done to the injury *or* damage of any person," etc., shall notify the carrier to "desist from such violation or to make *reparation* for the injury so found to have been done, or both." Here are two things that the commission is to require the carrier to do: First, to desist from violation; and, second (if he has not already desisted), to make reparation. Here again, in clear language, is authority to require not only the stopping of the existing exaction, but the affirmative action on the part of the carrier to make his conduct conform to the law. The first section says that the charge must be reasonable. The commission is to require that to be done, and of course it is impossible to decide that the carrier shall be reasonable without saying, as an inseparable part of such

a decision, what is reasonable. To stop by saying that the carrier shall be reasonable would amount in substance only to a moral lecture.

Then section 16 provides for an application to the court in cases where the carrier refuses to obey the order of the commission.

The words "lawful order" mean an order which the commission has *jurisdiction* to make. An order may be lawful and at the same time erroneous, so that if the commission made an order in a matter over which they had jurisdiction, which was merely an error in judgment, as to precisely the degree of reparation, for instance, the carrier ought to make, the order would still be lawful. In such a case the court is to "hear and determine the *matter*" — that is, the whole *subject*, "as a court of equity . . . in such manner as to do *justice* in the *premises*" — that is, complete justice in the whole premises. Premises is not merely the particular order that the commission have made, but it is the whole subject that had been duly brought before the commission and on due notice and hearing had been acted upon. It is that duty which rested with the Circuit Court which is now imposed upon this court.

V. All the preceding action described is not "fixing rates" in the sense that state commissioners of railways are authorized by their legislatures to establish general rates for all classes and for all railways, as is contended for by the defendants. We make no such claim. The action of the commission and the action of this court on what is really an appeal from and a review of the judgment is the trial and determination of a particular case and determining for that particular case what the conduct of the carrier shall be in respect of the particular dispute involved in it. It is the exertion of no general power to prejudge or to fix rates, nor is it the exertion of any power to fix rates in general. If this distinction be observed, there is no difficulty whatever. This is precisely in accord with what Justice Shiras said. After stating what had happened before the commission, and stating that in the Circuit Court evidence was introduced which had not been laid before the commission, showing that the rate to Birmingham had been forced

down by the coming in of a new competitive road, and that the Circuit Court had thereupon found that the evidence was sufficient to overcome the findings of the commission, and that the rate complained of was not unreasonable; and after stating that the Circuit Court of Appeals had adopted the views of the Circuit Court in respect of the reasonableness of the rate from Cincinnati to Atlanta, and " as both courts found the existing rate to have been reasonable, we do not feel disposed to review their finding on that matter of fact," he then condemned the conduct of the carriers in lying by. He then says, " Whether Congress intended to confer upon the Interstate Commerce Commission the power to itself fix rates was mooted in the courts below and is discussed in the briefs of counsel." He says, " We do not find any provision of the act which expressly or by necessary implication confers such power," and so forth. He then says, " The reasonableness of the rate in a given case depends on facts, and the function of the commission is to consider these facts and give them their proper weight. If the commission, instead of withholding judgment in such a matter until an issue shall be made and the facts found, itself fix a rate, that rate is prejudged by the commission to be reasonable." In this proposition we entirely concur, but in this case the identical question was raised by the petitions, an, issue was made, evidence was taken on both sides, and the facts found, so that the sum fixed as reasonable by the commission was not prejudged. And he adds that, " subject to the two leading prohibitions that their charges shall not be unjust and unreasonable, and that they shall not unjustly discriminate, so as to give undue preference or advantage, or subject to undue prejudice or disadvantage persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at common law." Here, again, it will be seen that reasonableness and unreasonableness, justice and injustice, preference, advantage, prejudice, disadvantage, are the very subjects that he says are within the competence of the commission to determine. If the Supreme Court had been of opinion that the action of the commission in its decision in regard to the Atlanta rate was beyond its jurisdictional power,

they would have so said, and affirmed the judgment on that ground; but in distinct terms they affirm the judgment of the Circuit Court and the Court of Appeals upon the express ground that the commission was in error in its finding of fact.

VI. Section 3 provides against "any undue or unreasonable preference or advantage to any . . . locality, or any particular description of traffic," etc.

Section 3 is to be *enforced by the commission*. How is this *possibly* to be done otherwise than by commanding *action* by their carriers suited to the nature of the case, so as to obliterate the whole "undue preference," etc. ? And how possibly otherwise can "*reparation*" be made to a "locality" ? Reparation means "restoration" of the right.

VII. The Circuit Court had full power to decree what the commission ought to have required in any case within its jurisdiction, and this is precisely what the Court of Appeals did, and what the Supreme Court affirmed in the *Social Circle case*. In the present case the commission ordered two things: First, that the defendants desist from charging their then existing prices, and, second, that the defendants do not charge more than a named price, which the commission found to be reasonable and non-preferential. If what the commission thus decided was right upon the whole facts of the case as they now appear, where is the want of power in this court to affirm their judgment; or, if the commission was wrong in degree, why has not this court, under the positive command of the statute to do justice in the premises, the power to say what ought to be done? It is the duty of the courts to endeavor, so far as the language of the act will allow, to execute its spirit and purpose. The act is in all civil respects a remedial act, and is therefore entitled to be liberally construed, if a liberal construction to effect its purpose be necessary. But in this case we need invoke no such principles, for, we submit, the language of the act is clear.

VIII. Every essential and nearly every primary fact found by the commission is really unchallenged, and, if challenged, is clearly supported by the whole tenor of the oral and documentary evidence. Only the conclusion of unrea-

sonableness in price and the conclusion of undue preference are disputed.

The fundamental and detailed circumstances of the whole case were developed before the commission. Witnesses were examined and documents produced on both sides. The additional evidence does not change any of the facts and circumstances appearing before the commission. There are discussions and speculations and opinions in abundance from the defendants' witnesses, speaking under the strongest bias.

By their own account of the conduct of their own lines toward each other they are in the frequent habit of exercising bad faith and doing secretly what they had solemnly engaged they would not do. Testimony from such sources (particularly mere opinions) is not entitled to much consideration against the great leading facts of the railway and steamship association contract and the contrivances attending them and their conduct appearing in the case.

The evidence of the complainants' witnesses before the commission shows distinctly the unreasonableness of the prices, and *very* distinctly the undue preference for eastern territory accomplished by the association contract and by the territorial lines which the carriers will not allow to be crossed.

The unreasonableness of the prices was attempted to be defended by the defendants' witnesses on the ground that the lines north of the Ohio fix their own rates and the lines south of the Ohio fix theirs, and that the shippers had no right to look at the distances, etc., traversed by the lines on both sides of the Ohio as one system. This contention is exploded by the decision in the *Social Circle case*, where it was held that if the carriers went into the business of through traffic at all, the reasonableness and so forth of the whole rate from the point of shipment to the point of destination was to be considered together.

In spite of the assertions of some of the defendants' witnesses that distance has nothing to do with the fixing of prices for carriage, it appears from their own testimony, as well as all the other evidence, that in every transaction

between themselves and in every aspect of carriage their results, divisions of receipts, and their management are based almost, if not quite, entirely upon that very thing. And in the internal considerations of every company we find that they make up their conclusions of gain or loss from statistics and accounts kept in respect of distance and mileage, and so forth. And it is obvious enough that the truth of the cost and profit of their operations can be ascertained only in that way, and out of that what the carrier may consider to be a reasonable price (from his point of view) for carriage is determined. We refer, as a matter of public knowledge, for illustration of this, to the printed annual reports of the Lake Shore system; and the same thing will be found in all, or nearly all, of the full and detailed printed reports of great numbers of railways of the country.

Applying these principles and practices to the case in hand, we will take from the undisputed record a single illustration to show the enormous disparity between the eastern and western traffic, based on the railway's own established constructive mileage:

New York to Knoxville: Constructive miles, seven hundred and sixty-three; rate, one hundred cents per one hundred pounds; equals thirteen one-hundredths of a cent per mile.

Chicago to Knoxville: Five hundred and sixty miles; rate, one hundred and sixteen cents per one hundred pounds; equals twenty one-hundredths of a cent per mile.

Cincinnati to Knoxville: Two hundred and ninety miles; rate, seventy-six cents per one hundred pounds; equals twenty one-hundredths of a cent per mile.

On the New York rate the rate from Chicago to Knoxville would be seventy-three and eight-tenths cents per one hundred pounds instead of one hundred and sixteen cents per one hundred pounds.

All the details of rates prove in general the same great disparity.

Again, the eastern distance is only computed from New York, so that the whole great territory to the north and east of New York gets the same rate that New York itself does.

This operates in respect of a great many articles to give the territory one hundred or more miles further from the points of delivery that much greater advantage over the territory of which Chicago and Cincinnati are the typical points.

No witness for the defendants even has said that they cannot carry at a great profit at the prices fixed by the commission.

IX. As to the undue preference, the principal and apparently only answer that the defendants' witnesses make is that if the western rates were reduced, the eastern rates would be reduced also. If this should be so, it furnishes no reason for this court hesitating to do justice. The consequences must take care of themselves. It is monstrous to maintain that, if the carriers are compelled to do right, they will, as between themselves, proceed (in the elegant language of the defendants' counsel) "to cut each others' throats." If they do, the eastern and western territory will stand on an equality, and the rates, it may be presumed, will not then be grossly unreasonable as against the shipper.

It is earnestly contended by the defendants that such a reduction as is required by the commission will make a great diminution of revenue. This may or may not be so, but the stopping of every extortion necessarily diminishes the profits of the extortioner. It is submitted that this is no reason for the commission or this court failing to require conduct on the part of the carriers that is right in itself.

X. The real key and fortress of this whole injustice on the part of the carriers is found in the treaty between the defendant lines known as the "Southern Railway and Steamship Traffic Association Contract." An agreement to maintain certain rates, so long as they shall be reasonable and so long as they shall not make undue discrimination between persons and localities, is perfectly lawful for carriers to make; but an agreement that carriers shall divide the country or any part of it into sections and make prohibitory rates, as they themselves say they have done, on business crossing the line, establishes an absolute monopoly, and, it is submitted, is as clearly a violation of the interstate commerce law and of the

trust law as it is of the common law. This was the very purpose as well as the effect of the contract. The resolutions adopted at the meetings and by the various committees all absolutely demonstrate this purpose.

It is said by the defendants that everything must be right because manufacturers in the west have increased. This does not follow at all. Manufacturers in the west have increased in spite of the injustice of these transactions between the carriers, and these manufacturers have been compelled to find their chief market in the great and growing northwest, and have been kept out of the south in a very large degree in consequence of this monopolistic tyranny.

We refer on these subjects in general to the testimony of the complainants' witnesses, taken before the commission, and to the testimony of the defendants' witnesses : Eger, pages 197–199 ; Peck, page 405 ; Davant, page 208 ; Culp, page 267 ; Smith, page 784 ; and see especially complainants' witnesses before the commission : Mann, pages 16, 17 ; Reed, pages 16–18.

XI. The alleged water competition set up to explain the obvious inequality of eastern and western rates is completely disposed of by the value and effect of the water competition having been by the railway and water carriers themselves ascertained and defined by treating three miles of water as equal to one mile of rail transportation, and the contention that outside of that there are tramp and sailing vessels is also disposed of, though these can have no real influence upon the subject, by the testimony of one or more of the defendants' witnesses stating that they do not allow these vessels to compete for the kind of traffic that can have any play in the consideration of the present questions ; and it is obvious enough that the difficulties attending shipments and unlading by tramp steamers to connect with the lines of these railways would make it impossible to accomplish anything ; and as to sailing vessels, nothing but the coarsest and least valuable commodities, in respect of which time and safety play a very small part, can be carried at all.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

A similar question was before us at the last term in *Cincinnati, New Orleans & Texas Pacific Railway* v. *Interstate Commerce Commission*, 162 U. S. 184, and in the opinion, on pages 196 and 197, we said:

" Whether Congress intended to confer upon the Interstate Commerce Commission the power to itself fix rates, was mooted in the courts below, and is discussed in the briefs of counsel.

" We do not find any provision of the act that expressly, or by necessary implication, confers such a power.

" It is argued on behalf of the commission that the power to pass upon the reasonableness of existing rates implies a right to prescribe rates. This is not necessarily so. The reasonableness of the rate, in a given case, depends on the facts, and the function of the commission is to consider these facts and give them their proper weight. If the commission, instead of withholding judgment in such a matter until an issue shall be made and the facts found, itself fixes a rate, that rate is prejudged by the commission to be reasonable.

" We prefer to adopt the view expressed by the late Justice Jackson, when Circuit Judge, in the case of the *Interstate Commerce Commission* v. *Baltimore & Ohio Railroad Co.*, 43 Fed. Rep. 37, and whose judgment was affirmed by this court, 145 U. S. 263:

" ' Subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate, so as to give undue preference or disadvantage to persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at the common law, free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests upon the same principles which are regarded as sound, and adopted in other trades and pursuits.' "

The views thus expressed have been vigorously and earnestly challenged in this and in other cases argued at the present term. In view of its importance, and the full arguments that have been presented, we have deemed it our duty to reëxamine the question in its entirety, and to determine what powers Congress has given to this commission in respect to the matter of rates. The importance of the question cannot be overestimated. Billions of dollars are invested in railroad properties. Millions of passengers, as well as millions of tons of freight, are moved each year by the railroad companies, and this transportation is carried on by a multitude of corporations working in different parts of the country and subjected to varying and diverse conditions.

Before the passage of the act it was generally believed that there were great abuses in railroad management and railroad transportation, and the grave question which Congress had to consider was how those abuses should be corrected and what control should be taken of the business of such corporations. The present inquiry is limited to the question as to what it determined should be done with reference to the matter of rates. There were three obvious and dissimilar courses open for consideration. Congress might itself prescribe the rates; or it might commit to some subordinate tribunal this duty; or it might leave with the companies the right to fix rates, subject to regulations and restrictions, as well as to that rule which is as old as the existence of common carriers, to wit, that rates must be reasonable. There is nothing in the act fixing rates. Congress did not attempt to exercise that power, and if we examine the legislative and public history of the day it is apparent that there was no serious thought of doing so.

The question debated is whether it vested in the commission the power and the duty to fix rates; and the fact that this is a debatable question, and has been most strenuously and earnestly debated, is very persuasive that it did not. The grant of such a power is never to be implied. The power itself is so vast and comprehensive, so largely affecting the rights of carrier and shipper, as well as indirectly all commercial trans-

actions, the language by which the power is given had been so often used and was so familiar to the legislative mind and is capable of such definite and exact statement, that no just rule of construction would tolerate a grant of such power by mere implication. Administrative control over railroads through boards or commissions was no new thing. It had been resorted to in England and in many of the States of this Union. In England, while control had been given in respect to discrimination and undue preferences, no power had been given to prescribe a tariff of rates. In this country the practice had been varying. It will be interesting to notice the provisions in the legislation of different States. We quote the exact language, following some of the quotations with citations of cases in which the statute has been construed:

ALABAMA, Code 1886, Title 12, c. 2, § 1130: "Exercise a watchful and careful supervision over all tariffs and their operations, and revise the same, from time to time, as justice to the public and the railroads may require, and increase or reduce any of the rates, as experience and business operations may show to be just."

CALIFORNIA. In the constitution, going into effect January 1, 1880, article 12, sec. 22: "Said commissioners shall have the power, and it shall be their duty, to establish rates of charges for the transportation of passengers and freight by railroad or other transportation companies, and publish the same from time to time, with such changes as they may make."

FLORIDA, Session Laws 1887, c. 3746, § 5: "Make and fix reasonable and just rates of freights and passenger tariffs, to be observed by all railroad companies doing business in this State, on the railroads thereof." *Railroad Commissioners* v. *Pensacola & Atlantic Railroad*, 24 Florida, 417.

GEORGIA, Code 1882, c. 7, § 719: "Make reasonable and just rates of freight and passenger tariffs, to be observed by all railroad companies doing business in this State on the railroads thereof." *Georgia Railroad* v. *Smith*, 70 Georgia, 694.

ILLINOIS, Statutes 1878 (Underwood's Edition), c. 114, § 93: "To make, for each of the railroad corporations doing business in this State, as soon as practicable, a schedule of reasonable

maximum rates of charges for the transportation of passengers and freights on cars on each of said railroads."

IOWA, Laws 1888, p. 42: "Make for each of the railroad -corporations, doing business in this State, as soon as practicable, a schedule of reasonable maximum rates of charges for the transportation of freight and cars on each of said railroads." *Burlington &c. Railway* v. *Dey*, 82 Iowa, 312.

MINNESOTA, Laws 1887, c. 10, § 8: "In case the commission shall at any time find that any part of the tariffs of rates, fares, charges or classifications so filed and published as hereinbefore provided, are in any respect unequal or unreasonable, it shall have the power, and is hereby authorized and directed to compel any common carrier to change the same and adopt such rate, fare, charge or classification as said commission shall declare to be equal and reasonable." *State* v. *Chicago, Milwaukee &c. Railway*, 40 Minnesota, 267.

MISSISSIPPI, Laws 1884, c. 23, § 6: "Shall so revise such tariffs as to allow a fair and just return on the value of such railroad, its appurtenances and equipments, . . . and to increase or reduce any of said rates according as experience and business operations may show to be just."

NEW HAMPSHIRE, Laws 1883, c. 101, § 4: "Fix tables of maximum charges for the transportation of passengers and freight upon the several railroads operating within this State, and shall change the same from time to time, as in the judgment of said board the public good may require; and said rates shall be binding upon the respective railroads." *Merrill* v. *Boston & Lowell Railroad*, 63 N. H. 259.

NORTH DAKOTA, Laws 1890, p. 354: "In case the commissioners shall at any time find that any part of the tariffs of rates, fares, charges or classifications, so filed and published, as herein provided, are in any respect unequal or unreasonable, they shall have the power and are hereby authorized and directed to compel any common carrier to change the same and adopt such rate, charge or classification as said commissioners shall declare to be equitable and reasonable."

SOUTH CAROLINA, Laws 1888, p. 65: "Authorized and required to make for each of the railroad corporations doing

business in this State, as soon as practicable, a schedule of reasonable and just rates of charges for the transportation of freights and cars on each of said railroads."

On the other hand in —

KANSAS, Laws 1883, c. 124, section 11, reads:

" No railroad company shall charge, demand or receive from any person, company or corporation, an unreasonable price for the transportation of persons or property, or for the hauling or storing of freight, or for the use of its cars, or for any privilege or service afforded by it in the transaction of its business as a railroad company.   And upon complaint in written, made to the board of railroad commissioners, that an unreasonable price has been charged, such board shall investigate said complaint, and if sustained shall make a certificate under their seal, setting forth what is a reasonable charge for the service rendered, which shall be *prima facie* evidence of the matters therein stated."

Section 18 authorized an inquiry upon the application of parties named in reference to freight tariffs and an adjudication upon such inquiry as to the reasonable charge for such freights.   Section 14 required a notice of the determination to be given to the railroad company, and a communication of a failure to comply with such determination in a report to the governor; and section 19 reads:

" Any railroad company which shall violate any of the provisions of this act shall forfeit for every such offence, to the person, company or corporation aggrieved thereby, three times the actual damages sustained by the said party aggrieved, together with the costs of suit, and a reasonable attorney's fee, to be fixed by the court; and if an appeal be taken from the judgment, or any part thereof, it shall be the duty of the appellate court to include in the judgment an additional reasonable attorney's fee for services in appellate court or courts."

The effect of these provisions was to make the determination of the commission *prima facie* evidence of what were reasonable rates, and to subject the railroad company failing to respect such determination or to prove error therein to the large penalties prescribed in section 19.

KENTUCKY.   The act of April 6, 1882, c. 90, § 1 (General Stat. p. 1021), provided that "if any railroad corporation shall wilfully charge, collect or receive more than a just and reasonable rate of toll or compensation for the transportation of passengers or freight in this State . . . it shall be guilty of extortion," etc.   Further sections created a commission, and by section 19 the commissioners were authorized to hear and determine complaints under the first and second sections of this act, and upon such complaint and hearing file their award with the clerk of the Circuit Court, which might be traversed by any party dissatisfied, and the controversy thereafter submitted to the court for consideration and judgment.

MASSACHUSETTS.   Pub. Stat. 1882, c. 112, § 14: "The board shall have the general supervision of all the railroads and railways, and shall examine the same."   Section 15: If it finds that any corporation has violated the provisions of the act, or any law of the Commonwealth, it shall give notice thereof in writing, and if the violation shall continue after such notice shall present the facts to the attorney general, who shall take such proceedings thereon as he may deem expedient.   By section 193 special authority is given to the board to revise the tariffs and fix rates for the transportation of milk.   See *Littlefield* v. *Fitchburg Railroad*, 158 Mass. 1.

NEW YORK.   Vol. 6, Rev. Stat. c. 39, contains the railroad law of the State.   By section 157, the board of railroad commissioners "shall have general supervision of all railroads."   By section 161, if in the judgment of the board it appears necessary that "additional terminal facilities shall be afforded, or that any change of rates of fare for transporting freights or passengers or in the mode of operating the road or conducting its business, is reasonable and expedient in order to promote the security, convenience and accommodation of the public, the board shall give notice and information in writing to the corporation of the improvements and changes which they deem proper"; and by section 162 "the Supreme Court at special term shall have power in its discretion in all cases of

decision and recommendations by the board which are just and reasonable to compel compliance therewith by mandamus, subject to appeal," etc.

This last section was enacted in 1892. (Laws 1892, c. 676), and prior thereto, in *People* v. *Lake Erie & Western Railroad*, 104 N. Y. 58, it was held that the judgment of the commissioners was not binding on the railroad company in respect to certain terminal facilities ordered, and could not be enforced by mandamus.

VERMONT. Laws 1886, No. 23, § 7, provided that if any railroad company "unjustly discriminates in its charges for transporting passengers or freight, or usurps any authority not granted by its charter, or wilfully refuses to comply with any reasonable recommendations of said board of commissioners, or enters into any combination or conspiracy with any other person, persons or corporation, whereby the rates of charge for transportation of freight or passengers, or the cost of commodities is unduly increased, said commissioners shall give notice thereof in writing to such corporation, or person, and if the act complained of is continued after such notice the board shall report the same to the then next session of the general assembly, and if in their judgment such action is irregular, may at any time make application to the Supreme or county court for any remedy warranted by law."

The legislation of other States is referred to in the Fourth Annual Report of the Interstate Commerce Commission, Appendix E, pages 243 and following. It is true that some of these statutes were passed after the interstate commerce act, but most were before, and they all show what phraseology has been deemed necessary whenever the intent has been to give to the commissioners the legislative power of fixing rates.

It is one thing to inquire whether the rates which have been charged and collected are reasonable — that is a judicial act; but an entirely different thing to prescribe rates which shall be charged in the future — that is a legislative act. *Chicago, Milwaukee &c. Railway* v. *Minnesota.*, 134 U. S. 418, 458; *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S.

362, 397; *St. Louis & San Francisco Railway* v. *Gill*, 156 U. S. 649, 663; *Cincinnati, New Orleans &c. Railway* v. *Interstate Commerce Commission*, 162 U. S. 184, 196; *Texas & Pacific Railway* v. *Interstate Commerce Commission*, 162 U. S. 197, 216; *Munn* v. *Illinois*, 94 U. S. 113, 144; *Peik* v. *Chicago & Northwestern Railway*, 94 U. S. 164, 178; *Express cases*, 117 U. S. 1, 29.

It will be perceived that in this case the Interstate Commerce Commission assumed the right to prescribe rates which should control in the future, and their application to the court was for a mandamus to compel the companies to comply with their decision; that is, to abide by their legislative determination as to the maximum rates to be observed in the future. Now, nowhere in the interstate commerce act do we find words similar to those in the statutes referred to, giving to the commission power to "increase or reduce any of the rates"; "to establish rates of charges"; "to make and fix reasonable and just rates of freight and passenger tariffs"; "to make a schedule of reasonable maximum rates of charges"; "to fix tables of maximum charges"; to compel the carrier "to adopt such rate, charge or classification as said commissioners shall declare to be equitable and reasonable." The power, therefore, is not expressly given. Whence then is it deduced? In the first section it is provided that "all charges . . . shall be reasonable and just; and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful." Then follow sections prohibiting discrimination, undue preferences, higher charges for a short than for a long haul, and pooling, and also making provision for the preparation by the companies of schedules of rates, and requiring their publication. Section 11 creates the Interstate Commerce Commission. Section 12, as amended March 2, 1889, (25 Stat. 858,) gives it authority to inquire into the management of the business of all common carriers, to demand full and complete information from them, and adds, "and the commission is hereby authorized to execute and enforce the provisions of this act." And the argument is that in enforcing and executing the provisions of the act it

is to execute and enforce the law as stated in the first section, which is that all charges shall be reasonable and just, and that every unjust and unreasonable charge is prohibited; that it cannot enforce this mandate of the law without a determination of what are reasonable and just charges; and as no other tribunal is created for such determination, therefore it must be implied that it is authorized to make the determination, and, having made it, apply to the courts for a mandamus to compel the enforcement of such determination. In other words, that though Congress has not in terms given the commission the power to determine what are just and reasonable rates for the future, yet as no other tribunal has been provided, it must have intended that the commission should exercise the power. We do not think this argument can be sustained. If there were nothing else in the act than the first section commanding reasonable rates, and the twelfth empowering the commission to execute and enforce the provisions of the act, we should be of the opinion that Congress did not intend to give to the commission the power to prescribe any tariff and determine what for the future should be reasonable and just rates. The power given is the power to execute and enforce, not to legislate. The power given is partly judicial, partly executive and administrative, but not legislative. Pertinent in this respect are these observations of counsel for the appellees:

"Article II, sec. 3, of the Constitution of the United States, ordains that the President ' shall take care that the laws be faithfully executed.' The act to regulate commerce is one of those laws. But it will not be argued that the President, by implication, possesses the power to make rates for carriers engaged in interstate commerce." . . .

"The first section simply enacted the common law requirement that all charges shall be reasonable and just. For more than a hundred years it has been the affirmative duty of the courts ' to execute and enforce' the common law requirement that ' all charges shall be reasonable and just'; and yet it has never been claimed that the courts, by implication, possessed the power to make rates for carriers."

But the power of fixing rates under the interstate commerce act is not to be determined by any mere considerations of omission or implication. The act contemplates the fixing of rates and recognizes the authority in which the power exists. Section 6 provides, among other things, "that every common carrier subject to the provisions of this act shall print and keep open to public inspection schedules showing the rates and fares and charges for the transportation of passengers and property which any such common carrier has established and which are in force at the time upon its route. . . . Such schedule shall be plainly printed in large type, and copies for the use of the public shall be posted in two public and conspicuous places, in every depot, station or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected." . . .

"No advance shall be made in the rates, fares and charges which have been established and published as aforesaid by any common carrier in compliance with the requirements of this section, except after ten days' public notice, which shall plainly state the changes proposed to be made in the schedule then in force, and the time when the increased rates, fares or charges will go into effect; and the proposed changes shall be shown by printing new schedules, or shall be plainly indicated upon the schedules in force at the time and kept open to public inspection. Reductions in such published rates, fares or charges shall only be made after three days' previous public notice, to be given in the same manner that notice of an advance in rates must be given.

"And when any such common carrier shall have established and published its rates, fares and charges in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates, fares and charges as may at the time be in force.

"Every common carrier subject to the provisions of this act shall file with the commission hereinafter provided for, copies of its schedules of rates, fares and charges which have been established and published in compliance with the requirements of this section, and shall promptly notify said commission of all changes made in the same. Every such common carrier shall also file with said commission copies of all contracts, agreements or arrangements with other common carriers in relation to any traffic affected by the provisions of this act to which it may be a party. And in cases where passengers and freight pass over continuous lines or routes operated by more than one common carrier, and the several common carriers operating such lines or routes establish joint tariffs of rates or fares or charges for such continuous lines or routes, copies of such joint tariffs shall also, in like manner, be filed with said commission. Such joint rates, fares and charges on such continuous lines so filed as aforesaid shall be made public by such common carriers when directed by said commission, in so far as may, in the judgment of the commission, be deemed practicable; and said commission shall from time to time prescribe the measure of publicity which shall be given to such rates, fares and charges, or to such part of them as it may deem it practicable for such common carriers to publish, and the places in which they shall be published.

"No advance shall be made in joint rates, fares and charges, shown upon joint tariffs, except after ten days' notice to the commission, which shall plainly state the changes proposed to be made in the schedule then in force, and the time when the increased rates, fares or charges will go into effect. No reduction shall be made in joint rates, fares and charges, except after three days' notice, to be given to the commission as is above provided in the case of an advance of joint rates. The commission may make public such proposed advances, or such reductions, in such manner as may, in its judgment, be deemed practicable, and may prescribe from time to time the measure of publicity which common carriers shall give to advances or reductions in joint tariffs.

"It shall be unlawful for any common carrier, party to any

joint tariff, to charge, demand, collect or receive from any person or persons a greater or less compensation for the transportation of persons or property, or for any services in connection therewith, between any points as to which a joint rate, fare or charge is named thereon than is specified in the schedule filed with the commission in force at the time.

"The commission may determine and prescribe the form in which the schedules required by this section to be kept open to public inspection shall be prepared and arranged, and may change the form from time to time as shall be found expedient."

. Finally, the section provides that if any common carrier fails or neglects or refuses to file or publish its schedules as provided in the section, it may be subject to a writ of mandamus issued in the name of the people of the United States at the relation of the commission. Now, but for this act it would be unquestioned that the carrier had the right to prescribe its tariff of rates and charges, subject to the limitation that such rates and charges should be reasonable. This section 6 recognizes that right, and provides for its continuance. It speaks of schedules showing rates and fares and charges which the common carrier "has established and which are in force." It does not say that the schedules thus prepared, and which are to be submitted to the commission, are subject, in any way, to the latter's approval. Filing with the commission and publication by posting in the various stations are all that is required, and are the only limitations placed on the carrier in respect to the fixing of its tariff. Not only is it thus plainly stated that the rates are those which the carrier shall establish, but the prohibitions upon change are limited in the case of an advance by ten days' public notice, and on reduction by three days. Nothing is said about the concurrence or approval of the commission, but they are to be made at the will of the carrier. Not only are there these provisions in reference to the tariff upon its own line; but further when two carriers shall unite in a joint tariff (and such union is nowhere made obligatory, but is simply permissive), the requirement is only that such joint tariff shall be filed with the commission,

and nothing but the kind and extent of publication thereof is left to the discretion of the commission.

It will be perceived that the section contemplates a change in rates either by increase or reduction, and provides the conditions therefor; but of what significance is the grant of this privilege to the carrier if the future rate has been prescribed by an order of the commission, and compliance with that order enforced by a judgment of the court in mandamus? The very idea of an order prescribing rates for the future, and a judgment of the court directing compliance with that order, is one of permanence. Could anything be more absurd than to ask a judgment of the court in mandamus proceedings that the defendant comply with a certain order unless it elects not to do so? The fact that the carrier is given the power to establish in the first instance, and the right to change, and the conditions of such change specified, is irresistible evidence that this action on the part of the carrier is not subordinate to and dependent upon the judgment of the commission.

We have, therefore, these considerations presented: First. The power to prescribe a tariff of rates for carriage by a common carrier is a legislative and not an administrative or judicial function, and, having respect to the large amount of property invested in railroads, the various companies engaged therein, the thousands of miles of road, and the millions of tons of freight carried, the varying and diverse conditions attaching to such carriage, is a power of supreme delicacy and importance. Second. That Congress has transferred such a power to any administrative body is not to be presumed or implied from any doubtful and uncertain language. The words and phrases efficacious to make such a delegation of power are well understood and have been frequently used, and if Congress had intended to grant such a power to the Interstate Commerce Commission it cannot be doubted that it would have used language open to no misconstruction, but clear and direct. Third. Incorporating into a statute the common law obligation resting upon the carrier to make all its charges reasonable and just, and directing the commission to execute and enforce the provisions of the act, does not by

implication carry to the commission or invest it with the power
to exercise the legislative function of prescribing rates which
shall control in the future.    Fourth. Beyond the inference
which irresistibly follows from the omission to grant in express
terms to the commission this power of fixing rates, is the clear
language of section 6, recognizing the right of the carrier to
establish rates, to increase or reduce them, and prescribing the
conditions upon which such increase or reduction may be
made, and requiring, as the only conditions of its action, first,
publication, and, second, the filing of the tariff with the com-
mission.    The grant to the commission of the power to pre-
scribe the form of the schedules, and to direct the place and
manner of publication of joint rates, thus specifying the scope
and limit of its functions in this respect, strengthens the con-
clusion that the power to prescribe rates or fix any tariff for
the future is not among the powers granted to the commission.

These considerations convince us that under the interstate
commerce act the commission has no power to prescribe the
tariff of rates which shall control in the future, and, there-
fore, cannot invoke a judgment in mandamus from the courts
to enforce any such tariff by it prescribed.

But has the commission no functions to perform in respect
to the matter of rates; no power to make any inquiry in
respect thereto?   Unquestionably it has, and most important
duties in respect to this matter.   It is charged with the
general duty of inquiring as to the management of the
business of railroad companies, and to keep itself informed
as to the manner in which the same is conducted, and has
the right to compel complete and full information as to the
manner in which such carriers are transacting their business.
And with this knowledge it is charged with the duty of see-
ing that there is no violation of the long and short haul
clause; that there is no discrimination between individual
shippers, and that nothing is done by rebate or any other
device to give preference to one as against another; that no
undue preferences are given to one place or places or individ-
ual or class of individuals, but that in all things that equality
of right, which is the great purpose of the interstate com-

merce act, shall be secured to all shippers. It must also see that that publicity, which is required by section 6, is observed by the railroad companies. Holding the railroad companies to strict compliance with all these statutory provisions and enforcing obedience to all these provisions tends, as observed by Commissioner Cooley in *In re Chicago, St. Paul & Kansas City Railway*, 2 Int. Com. Com. Rep. 231, 261, to both reasonableness and equality of rate as contemplated by the interstate commerce act.

We have not overlooked the statute of Nebraska, nor the decision of the Supreme Court of that State in respect thereto. This statute was approved March 31, 1887, a few weeks after the passage of the interstate commerce act (Laws Nebraska, 1887, p. 540), and was obviously largely patterned upon that act. The general obligations incorporated into that act in respect to reasonableness of rates, prohibitions of discrimination, undue preferences, etc., are all in the Nebraska statute. A commission, called "a board of transportation," is also provided for (section 11), and is charged with the general duty of enforcing the act and supervising the railroad companies in the State. Section 17, which is more full and specific than any to be found in the interstate commerce act, provides that "said board shall have the general supervision of all railroads operated by steam in the State, and shall inquire into any neglect of duty or violation of any of the laws of this State by railroad corporations. . . . It shall carefully investigate any complaint made in writing, and under oath, concerning any lack of facilities, . . . or against any unjust discrimination against either any person, firm, or corporation or locality, either in rates, facilities furnished or otherwise; and whenever, in the judgment of said board . . . any change in the mode of conducting its business or operating its road is reasonable and expedient in order to promote the security and accommodation of the public, or in order to prevent unjust discriminations against either persons or places; it shall make a finding of the facts, and an order requiring said railroad corporation to make such repairs, improvements," etc.

In *State* v. *Fremont, Elkhorn &c. Railroad*, 22 Nebraska, 313, it appeared that the board of transportation had found that certain rates enforced upon the road of the defendant company were excessive, and that certain other rates less than those in force were reasonable and just. On application to the Supreme Court it was held that the State was entitled to a mandamus compelling obedience to such determination, the court observing, p. 329 : " In the case under consideration the board found that the rates and charges of the respondent were excessive; in other words, that there was unjust discrimination against that part of the State, and, having so found, the board is clothed with ample power to require such railway company to reduce its rates and charges. The power of the board, therefore, to establish and regulate rates and charges upon railways within the State of Nebraska is full, ample and complete."

Without criticising in the least the logic of this decision, it is enough to say that it is based upon a section which gives wider and more comprehensive power to the supervising board than is given in the interstate commerce act to the commission, and does not justify the inference that the latter has the same power in respect to prescribing rates that by such decision was declared to belong to the Nebraska board of transportation.

Some reliance was placed in the argument on this sentence, found in the opinion of this court in *Cincinnati, New Orleans &c. Railway* v. *Interstate Commerce Commission*, 162 U. S. 184, 196, " if the commission, instead of withholding judgment in such a matter until an issue shall be made and the facts found, itself fixes a rate, that rate is prejudged by the commission to be reasonable." And it is thought that this court meant thereby that while the commission was not in the first instance authorized to fix a rate, yet that it could, whenever complaint of an existing rate was made, give notice and direct a hearing, and upon such hearing determine whether the rate established was reasonable or unreasonable, and also what would be a reasonable rate if the one prescribed was found not to be, and that such order could be made the basis of a judg-

ment in mandamus requiring the carrier thereafter to conform to such new rate.  And the argument is now made, and made with force, that while the commission may not have the legislative power of establishing rates, it has the judicial power of determining that a rate already established is unreasonable, and with it the power of determining what should be a reasonable rate, and of enforcing its judgment in this respect by proceedings in mandamus.

The vice of this argument is that it is building up indirectly and by implication a power which is not in terms granted.  It is not to be supposed that Congress would ever authorize an administrative body to establish rates without inquiry and examination; to evolve, as it were, out of its own consciousness, the satisfactory solution of the difficult problem of just and reasonable rates for all the various roads in the country.  And if it had intended to grant the power to establish rates, it would have said so in unmistakable terms.  In this connection it must be borne in mind that the commission is not limited in its inquiry and action to cases in which a formal complaint has been made, but, under section 13, "may institute any inquiry on its own motion in the same manner and to the same effect as though complaint had been made."  By section 14 whenever an investigation is made by the commission, it becomes its duty to make a report in writing, which shall include a finding of the facts upon which its conclusions are based, together with a recommendation as to what reparation, if any, ought to be made to any party or parties who may be found to have been injured.  And by sections 15 and 16, if it appears to the satisfaction of the commission that anything has been done or omitted to be done, in violation of the provisions of the act, or of any law cognizable by the commission, it is made its duty to cause a copy of its report to be delivered to the carrier, with notice to desist, and failing that to apply to the courts for an order compelling obedience.  There is nothing in the act requiring the commission to proceed singly against each railroad company for each supposed or alleged violation of the act.  In this very case the order of the commission was directed against a score or more of companies and determined

the maximum rates on half a dozen classes of freight from Cincinnati and Chicago respectively to several named southern points and the territory contiguous thereto, so that if the power exists, as is claimed, there would be no escape from the conclusion that it would be within the discretion of the commission of its own motion to suggest that the interstate rates on all the roads in the country were unjust and unreasonable, notify the several roads of such opinion, direct a hearing, and upon such hearing make one general order, reaching to every road and covering every rate. It will never do to make a provision prescribing the mode and manner applicable to all investigations and all actions equivalent to a grant of power in reference to some specific matter not otherwise conferred.

Again, it is said that this court, in *Interstate Commerce Commission* v. *Baltimore & Ohio Railroad*, 145 U. S. 263, 276, declared that "the principal objects of the interstate commerce act were to secure just and reasonable charges for transportation ; to prohibit," etc. ; but this by no means carries with it any suggestion that the way by which unjust and unreasonable rates were to be prevented was by intrusting to the commission the power to prescribe what should be charged.

Still again, it is urged that the commission has decided that it possesses this power and has acted upon such decision, and an appeal is made to the rule of cotemporaneous construction. But it would be strange if an administrative body could by any mere process of construction create for itself a power which Congress had not given to it. And, indeed, an examination of the decisions of the commission discloses this curious fact. In the early case of *Thatcher* v. *Delaware & Hudson Canal Company*, 1 Int. Com. Com. Rep. 152, 156, a case heard and decided in July of the year in which the commission was created, the commission declined, for lack of evidence, to fix certain rates, saying: "It is therefore impossible to fix them in this case, even if the commission had power to make rates generally, which it has not. Its power in respect to rates is to determine whether those which the roads impose are for any reason in conflict with the statute."

Again, it will be perceived that nowhere in the act is there

any suggestion of a maximum or minimum rate. The first section declares that the rates shall be reasonable and just, and prohibits every unreasonable and unjust charge. Now the rate may be unreasonable because it is too low as well as because it is too high. In the former case it is unreasonable and unjust to the stockholder, and in the latter to the shipper. It was declared by this court in *Covington & Lexington Turnpike Road Co.* v. *Sandford*, 164 U. S. 578, 597, that in determining the question of reasonableness " its duty is to take into consideration the interests both of the public and of the owner of the property "; but in the matter of the *Chicago, St. Paul & Kansas City Railway, supra,* the commission held that it had no power to order rates to be increased upon the ground that they were so low that persistence in them would be ruinous. The opinion in that case, prepared by Commissioner Cooley, and with his usual ability, while seeking to prove that under the provisions of the statute the commission has no power to prescribe a minimum or to establish an absolute rate but only to fix a maximum rate, goes on further to show how the operation of other provisions of the act tend to secure just and reasonable rates. Were it not for its length, we should be glad to quote all that he says on the subject. We think that nearly all of the argument which he makes to show that the commission has no power to fix a minimum or establish an absolute rate, goes also to show that it has no power to prescribe any tariff, or fix any rate to control in the future.

Our conclusion then is that Congress has not conferred upon the commission the legislative power of prescribing rates either maximum or minimum or absolute. As it did not give the express power to the commission it did not intend to secure the same result indirectly by empowering that tribunal to determine what in reference to the past was reasonable and just, whether as maximum, minimum or absolute, and then enable it to obtain from the courts a peremptory order that in the future the railroad companies should follow the rates thus determined to have been in the past reasonable and just.

*The question certified must be answered in the negative, and
it is so ordered.*

MR. JUSTICE HARLAN dissented.