The **ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY**, Plaintiff,

v.

The **UNITED STATES** of America and the Interstate Commerce Commission, Defendants.

Civ. A. No. KC–2415.

United States District Court
D. Kansas.

March 5, 1968.

J. C. Gibson, Starr Thomas, S. R. Brittingham, Jr., Chicago, Ill., C. J. Putt, Topeka, Kan., Leonard O. Thomas, Kansas City, Kan., for plaintiff.

Newell A. George, U. S. Atty., Topeka, Kan., Donald F. Turner and John H. D. Wigger, Department of Justice, Washington, D. C., for United States.

Robert W. Ginnane, Robert S. Burk, Attorneys, Interstate Commerce Commission, Washington, D. C., for I. C. C.

## MEMORANDUM OF DECISION

Before SETH, Circuit Judge, ARTHUR J. STANLEY, Jr., and WESLEY E. BROWN, District Judge.

PER CURIAM.

This is an action instituted by the Atchison, Topeka and Santa Fe Railway Company to enjoin, set aside and suspend orders of the Interstate Commerce Commission entered in two combined administrative proceedings, wherein the Commission held that certain shipment detention practices provided by Santa Fe constituted an unpublished service of delay [1] and that certain tariff rules proposed by Santa Fe to authorize those practices were not just and reasonable.[2]

The action was brought pursuant to 28 U.S.C. §§ 1336, 1398, and 2321–2325. A three-judge court was convened pursuant to 28 U.S.C. § 2284. The United States was made a party as required by 28 U.S. C. § 2322. Plaintiff Santa Fe is a common carrier by railroad subject to the Interstate Commerce Act, 49 U.S.C. § 1 et seq.

Both of the proceedings were heard before the Commission on a common record and decided in one opinion, reported at 325 I.C.C. 228. In the investigation proceeding, the Commission found, specifically, that Santa Fe provided an unpublished service of delay in transit to certain shippers of potatoes from points in California to the Midwest, particularly Kansas City, Missouri, which delays result in free warehousing to shippers and undue detention of refrigerator cars, in violation of Section 6(7) of the Act, and Section 1 of the Elkins Act.[3]

Without abandoning its position that it offered no service of delay requiring tar-

1. Investigation Docket No. 34316.

2. Investigation and Suspension (I. & S.) Docket No. 7988, Routing Exceptions via AT & SF and Connecting Carriers, referred to generally as the tariff proceeding.

3. Section 6(1) of the Interstate Commerce Act provides in pertinent part:
"(1) Every common carrier subject to * * * this part shall file with the Commission * * * schedules showing all the rates * * * and shall plainly state * * * separately all terminal charges, storage, icing charges, and all other charges which the Commission may require, [and]

all privileges or facilities granted or allowed * * *."
Section 6(7) of that Act provides in pertinent part:
"No carrier * * * shall engage or participate in the transportation of * * * property * * * *unless the rates * * * and charges upon which the same are transported by said carrier have been filed and published * * *; * * * nor shall any carrier * * * extend to any shipper or person any privileges or facilities* in the transportation of * * * property, except such as are specified in such tariffs." [Emphasis supplied.]

iff authorization, Santa Fe proposed two tariff rules bringing the practice at issue under its single-factor through rate schedules. In the tariff proceedings, the Commission found the proposed rules were not just and reasonable.

The discernible facts are largely undisputed, and the Commission found the examiner's findings of fact correct in all material respects. From these facts, however, it reached conclusions contrary to those of the examiner.

Santa Fe annually ships a large volume of potatoes from Kern County, California, located in the San Joaquin Valley, where a large harvest of white potatoes is produced, including a variety known as the White Rose. The White Rose is harvested and marketed as a "new" potato, that is, unmatured with a high moisture content, which results in relatively poor keeping qualities. Harvest occurs from the middle of May to early July, when temperatures range from 100 to 115 degrees. Because of its immaturity, thin skin, and susceptibility to sunburn, the White Rose is highly perishable, and the harvesting process, from digging through washing and grading to loading into cars is sought to be accomplished in 2 to 2½ hours. Extended storage is harmful, and they are usually consumed within two to three weeks after harvest.

The peak harvest amounts to about 1,000 to 1,200 carloads daily. Available cold storage facilities in the locality are inadequate for this volume, so the potatoes are loaded in refrigerator cars and started rolling toward market directly. It cannot always absorb such volumes, and prices are depressed accordingly. Shippers seek to minimize adverse market reactions by delaying the arrival at market of potatoes unsold at the time of shipment.

Santa Fe has the most direct route between the growing areas and market points, and its service is too direct for those shippers seeking greater transit time. By 1947, shippers found that increased shipment time could be achieved by routing their unsold cars away from

Santa Fe at various short-haul California junctions, and forwarding them eastward over through routes comprising lines of connecting carriers, over which the through rate applies.

The quantity of unsold potatoes, and hence the number of cars subject to such circuitous routing, has varied from year to year. In some years the entire harvest may be sold at the time of shipment, and no circuitous routing is desired. In 1961, of 14,801 carloads handled by Santa Fe from Kern County origins, 1,582 cars, or approximately ten per cent, were subject to indirect routing; in 1962, of 10,932 cars, 1,032 were indirectly routed; in 1963, of 11,741 cars, only 389 were so treated.

Studies in 1947 indicated that Santa Fe was losing traffic at short-haul California junctions to competing connecting carriers with longer, indirect lines which required more travel time. Thereafter, Santa Fe commenced to accept shipments at the single-factor through rate routed internally over its own lines via circuitous routes. One of these internal routes is formed by Santa Fe lines reaching Denver and Houston. Because these two cities each lie at the end of a line segment, direct backhaul movements over those segments are required. It is undisputed that this route has the same general conformation and is no more circuitous than various indirect, multiple-line routes of competing carriers available to shippers seeking increased transit time.

Santa Fe has since, for convenience and reasons of economy, discontinued physical movement of shipments over the specified circuitous routes; instead, it holds these cars at or near icing stations at Belen, New Mexico, and Newton, Kansas. The finding as to the period of detention is ambiguous. The examiner states at one point that they are held "for periods of time equal to that required for accomplishment of the circuitry specified by the shipper," and at another that "[m]any were held for 10 days or more, some for as long as 16 to 18 days." Maximum travel time over circuitous routes including backhauls is eleven days.

Although it appears Santa Fe did hold cars for periods longer than travel time for the specified routes, Santa Fe defends the holding practice only insofar as holding periods equal travel time over the specified circuitous routes. It is on that basis the Commission disapproved the practice, and only that ruling which is before us.

When a hold point was filled, the cars first in were forwarded to the next hold point or, if the next point was Kansas City, and arrival was early, they would be backhauled to Newton, for further holding. The accumulation of cars at hold points necessitates at times an additional switch engine, and alternating crews for two engines, 24 hours a day. Hot weather necessitates daily icing of delayed cars, which the carrier provided without additional charge, and hence at carrier's expense.

Santa Fe urged a separate proposition in each of the proceedings combined before the Commission: in the investigation proceeding, it argued that the holding practice was not a service of delay and hence did not require publication; in the tariff proceeding, without abandoning this position, it proposed tariff rules providing for application of the single-factor through rate to internal circuitous routes including backhauls, and authorizing the described holding practices.

The Commission's opinion betrays an unfortunate confusion of the issues, which leads, in turn, to similarly unfortunate circularity of reasoning in resolving them. Having found the holding practice unlawful as an unpublished service, it proceeds to disapprove the proposed tariff rules authorizing the practice in part on the ground that the practice has already been determined unlawful.

■ We recognize the scope of judicial review of Commission decisions as defined by the Administrative Procedure Act at 5 U.S.C. § 706, that if its findings and conclusions are neither arbitrary, capricious nor an abuse of discretion, and are otherwise in accordance with law,

they must be upheld. However, the propriety of Commission action must be judged solely by the ground invoked by it, and if they are inadequate or improper, we are powerless to affirm its decision. See Securities & Exchange Commission v. Chenery Corp., 332 U.S. 194 at 196, 67 S.Ct. 1575, 91 L.Ed. 1995 at 1999 (1947); see also Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

The determination that the holding practice constitutes a service of delay rests on a reasonable basis and is not legally erroneous; hence, we may not disturb it. For reasons to be stated, the grounds invoked to disapprove the proposed tariff rules are inadequate, in our view, to support any decision, one way or the other, on the justness and reasonableness of those rules.

■ The first question is the correctness of the Commission's determination that the carrier's holding practice constitutes a service of delay. Santa Fe urges that it is legally erroneous. We disagree.

The Commission found that Santa Fe's direct route from Bakersfield, California, to Kansas City is 1,748 miles, and requires approximately 59 hours or three days under normal conditions. The longest circuitous route formed internally over Santa Fe's lines, including backhauls into and out of Denver and Houston, is 3,431 miles and requires eleven days. The mileage and running time of Santa Fe internal circuitous routes not involving backhauls does not appear.

Santa Fe argues that a holding schedule directly commensurate with physical travel time over a circuitous route specified by the shipper does not provide a service of "delay." This argument does not acquit the practice if the circuitous route itself provides a delay service and is not available under existing open route tariffs. Santa Fe ties its holding schedules to internal circuitous routes both which do and do not involve backhauls, on the ground that internal routes *not* involving backhauls are permissible under existing open tariffs, and that those

which do include backhauls ought to be permissible thereunder as a matter of law, the Commission's holding to the contrary being erroneous.

An expert witness for the Bureau of Inquiry and Compliance testified that a shipper has the right under open tariffs to designate circuitous internal routes over Santa Fe lines, as, for example, a route from California origins to La Junta, Colorado, thence to Amarillo, Texas, Fort Worth, and beyond to Kansas City, so long as no backhaul is involved. The Commission concedes that shippers may designate internal circuitous routes for application of the "intermediate rule," and for exercise of the privileges of inspection in transit. It does not concede nor unequivocally deny a statutory right to designate internal circuitous routes under an open tariff solely for purposes of delay.

■ The concession is unnecessary. This issue is ruled by United States v. Union Pacific Railroad Co., 173 F.Supp. 397 (S.D.Iowa 1959), aff'd per curiam, 362 U.S. 327, 80 S.Ct. 737, 4 L.Ed.2d 766, which the Commission properly deemed dispositive. The rule of Union Pacific is that any provision of transportation over internal circuitous routes solely to achieve increased time in transit, i. e., delay, constitutes an additional service, privilege or facility which must be published.

Santa Fe's attempt to tie its holding schedules to longer circuitous routes, those which do require back-hauls, is without merit. It is simply beyond dispute in this case that the purpose of routing potatoes circuitously over Santa Fe lines into and out of Denver and Houston is to increase time in transit,

to achieve delay in order for Santa Fe to meet its competition.

■ The Commission's rulings in the tariff proceeding have occasioned this court difficulty. We recognize that the determination of the justness and reasonableness of rates is peculiarly a matter for the judgment and discretion of the Commission. The Supreme Court stated thus in Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260 (1934):

"The structure of a rate schedule calls in peculiar measure for the use of that enlightened judgment which the commission by training and experience is qualified to form. * * * It is not the province of a court to absorb this function to itself. * * * The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body. [Citations omitted.]" 292 U.S. at 286–287, 54 S.Ct. at 694, 78 L.Ed. at 1265.

A determination that a rate is unreasonable or discriminatory is conclusive and binding upon the reviewing court if supported by substantial evidence, absent some procedural irregularity or erroneous application of a rule of law. Western Paper Makers' Chemical Co. v. United States, 271 U.S. 268, 46 S.Ct. 500, 70 L.Ed. 941 (1926). For reasons stated hereafter, we are persuaded the Commission has not fully discharged this responsibility in passing upon the proposed tariff rules.

Santa Fe proposed two separate rules, one for application of through rates to internal routes over its lines which involve backhauls and out-of-line movements,[4] the other authorizing, under the diversion and reconsignment tariff, hold-

---

4. Plaintiff proposed two items in this connection, the first one being suspended at the outset of the proceeding. The proposed substitute therefor, as modified at hearing by both plaintiff and the examiner provides approximately as follows:

"Rates will apply over Santa Fe Lines via points specified in the routing instruction of the bill of lading to the same extent that rates are authorized for application via other lines parties to this tariff via the same stations *and notwithstanding that such specified routing over Santa Fe lines involves backhauls or out-of-line movements or both.*" [Italics by examiner.]

ing schedules commensurate with such internal routes.[5]

Of the former [6] the Commission stated, "the respondent proposes [thus] to offer over its system lines only the same routing privileges as are available over directly competitive lines, and no more." By the latter [7] Santa Fe offers only an equivalent delay service by holding rather than by physical circuitous movement.

Regarding the class of shippers who need or desire delayed service, Santa Fe is at a natural disadvantage vis-a-vis competing connecting carriers, because it has the shortest direct route. To compete with the increased transit time afforded by normal expeditious movement over longer lines of other carriers, Santa Fe has created artificial delays by backhauls, out-of-line movements, and lastly in point of time, holding schedules. We have upheld the Commission's finding that these devices constitute services of delay, for which rates must be published and filed. At this point, the case is in precisely the posture of Union Pacific R. Co. v. United States, 362 U.S. 327, 80 S.Ct. 737, 4 L.Ed. 2d 766 (1960), in which the Court stated:

"If and when appellant publishes and files such a tariff, as other roads have already done, the Commission can then consider the reasonableness and justness of appellant's service in the light of that rate, giving due regard to any unjust or unreasonable preferences or advantages that might result to shippers or other roads should the same not be approved." 362 U.S. at 328, 80

S.Ct. at 738, 4 L.Ed.2d at 767. [Emphasis supplied.]

The opinion of the Commission does not reflect that consideration was given to any competitive disadvantage of Santa Fe and to any unreasonable or unjust preference or advantage accruing to other carriers with longer lines upon disapproval of the proposed rule.

The Commission disapproved the first item [8] on the ground, inter alia, that it authorized rates for application over Santa Fe lines to the same extent as rates are authorized for application via lines of other parties to the transcontinental rate tariff, and in net effect permitted shippers to specify routes other than those provided in the routing section of the rate tariff. Thus, it held the item fails to conform to Rule 4(k) of Tariff Circular 20, which provides that routing over which rates apply must be stated so as to be definitely ascertainable and that this must be accomplished either by making rates applicable over all routes made by use of the lines of any carrier party to the tariff, with exceptions specifically stated, (known as "open" routing) or by identifying the routes to which rates apply by specific description.

Santa Fe contends that routes in the proposed item, limited to internal routes, are as "definitely ascertainable" as those under "open" routing. We will not at this time go behind the Commission's rule, but from the findings of the Commission we cannot agree that the proposed item is per se a violation of that rule.

5. "When carload shipments of potatoes from origins in California moving under rates in TOFC Tariff 44–0 (I.C.C. No. 1673) via routes of Santa Fe Lines through Arizona are consigned to destinations on the Santa Fe Lines or to destinations beyond the Santa Fe Lines and routed via Santa Fe Lines via other than the direct routes as defined in Item 310, Santa Fe Lines will, at their convenience, hold such cars at Belen, N. M., or Newton, Kansas, for a period not exceeding five (5) days (See Note 1) or not exceeding the difference in the time between that customarily re-

quired for movement over the direct route. and that so required over the circuitous route whichever is the lesser, in lieu of performing the circuitous service specified in the Bill of Lading, unless otherwise directed by the shipper in writing. At the expiration of the lesser of such two periods, shipment will be reforwarded to billed destinations.
Note 1. In computing this time, Saturdays and Sundays will be excluded."

6. See Footnote 4, supra.

7. See Footnote 5, supra.

8. See Footnote 4, supra.

The second proposed rule [9] authorized holding schedules under Santa Fe's diversion and reconsignment tariff. This tariff provides for free backhauls and out-of-line movements, called "unusual hauls," when a change in destination involves an unusual haul from point of diversion or reconsignment through final destination point, provided the unusual haul does not exceed stated mileage limits graduated upward in consonance with ascending mileage on Santa Fe's lines. Special scales of rates apply to mileage which exceeds those permitted free of charge. The proposed item authorizes holding of cars along the Santa Fe direct route only so long as to render total transit time equal to that required for physical movement over indirect routes specified by the shippers. This was disapproved on three grounds: (1) that its limitation to potato shipments from California origins clearly demonstrates an intention to prefer a select class of shippers; (2) that it authorizes an unreasonable use of the diversion privilege strictly for delay in transit; and (3) that it authorizes internal hold schedules already found unlawful.

The Commission stated the rule prefers a select class of shippers. This class of shippers constitutes only those shippers of unsold carloads of White Rose potatoes who desire increased transit time, and can obtain it at through rates by routing shipments over longer lines of other carriers with whom Santa Fe must compete. By the proposed holding schedules, Santa Fe seeks to offer comparable delay at the same through rates only to those shippers.

In arguing that its holding practice is not a service requiring publication of rates therefor, Santa Fe urged that the practice was solely for its own convenience and economy. The Commission rejected this line of argument, pointing out that from the delay of some 1,000 cars, as happens in some years, Santa Fe could lose up to $48,000 through avoidance of demurrage fees, and that it incurred ad-ditional expense in icing and switching cars at hold points. The Commission also found that the practice resulted in undue detention of refrigerator cars. It conceded there was no evidence of any actual car shortage, but cited a 1959 memorandum of a Santa Fe freight traffic manager in San Francisco stating that delayed routing deprives the carrier of maximum use of equipment, contributes to car shortages, and produces low revenues.

These are all proper grounds for determining that the holding schedule constitutes an unlawful service of delay so long as no rule is published authorizing it. In passing upon the proposed rule, however, the alleged loss of maximum equipment use, avoidance of demurrage, and additional icing and switching expense must be weighed against any offsetting consequences of Santa Fe's loss of business, both indirectly and directly routed, to other carriers if Santa Fe cannot provide equivalent delay service.

Shippers avoid demurrage equally whether they ship over longer routes of other carriers, or permit Santa Fe to hold cars for a commensurate period along with its direct route. Likewise, increased transit time, however achieved, may require additional icing, additional equipment and can contribute to car shortages.

We cannot understand the Commission's finding that the rule is an unreasonable use of the diversion and reconsignment privilege when the shippers obtain the same result from routings over other lines.

The Commission found that the second proposed rule authorized internal hold schedules already found unlawful. This finding was based on the lack of publication of a tariff rule and not because the practice was unlawful per se.

■ We are constrained to hold, based on the record before us, that the grounds stated by the Commission for disapproving the proposed items in the tariff proceeding [10] do not afford a legally adequate basis for making the determination

9. See Footnote 5, supra.

10. See Footnote 2, supra.

of the unjustness and unreasonableness of the proposed rate.

We therefore hold that the order of the Interstate Commerce Commission in Docket No. 34316 should be affirmed, and the complaint of Santa Fe respecting that order dismissed.

We further hold that the order of the Commission in I. & S. Docket No. 7988 should be remanded to the Commission for further proceedings.

In compliance with Rule 58(2), F.R. Civ.P., there is filed herewith the Judgment and Decree of the Court.