**ARCHER DANIELS MIDLAND COMPANY and The Pillsbury Company, Plaintiffs,**

**and**

**Chicago and North Western Railway Company; Chicago Great Western Railway Company; Chicago, Milwaukee, St. Paul and Pacific Railroad Company; and Chicago, Rock Island and Pacific Railroad Company, Intervening Plaintiffs,**

**v.**

**UNITED STATES of America, and the Interstate Commerce Commission, Defendants,**

**and**

**Public Service Commission of the State of North Dakota; Chamber of Commerce of Grand Forks, North Dakota; North Dakota Mill and Elevator Association; North Dakota State Wheat Commission; Great Northern Railway Company; Union Pacific Railroad Company; Board of Trade of Kansas City, Missouri; Nebraska Consolidated Mills Company; and General Mills, Inc., Intervening Defendants.**

**No. 4–68 Civ. 166.**

United States District Court
D. Minnesota,
Fourth Division.
July 16, 1969.

Swidler & Belnap, by Harold E. Spencer and Daniel J. Sweeney, Chicago, Ill., and Rider, Bennett, Egan, Johnson & Arundel, by Stuart W. Rider, Jr., Minneapolis, Minn., for plaintiffs.

William F. Cottrell, Chicago, Ill., and Stringer, Donnelly & Sharood, by Philip Stringer, St. Paul, Minn., for intervening plaintiff Chicago and North Western Ry. Co.

Winston, Strawn, Smith & Patterson, by Bryce L. Hamilton, Chicago, Ill., and Stearns & Goetteman, by Harry S. Stearns, St. Paul, Minn., for intervening plaintiff Chicago Great Western Ry. Co.

Thomas H. Ploss, Chicago, Ill., and Rider, Bennett, Egan, Johnson & Arundel, by Stuart W. Rider, Jr., Minneapolis, Minn., for intervening plaintiff Chicago, Milwaukee, St. Paul and Pacific R. R. Co.

Don McDevitt, Chicago, Ill., and Stringer, Donnelly, & Sharood, by Philip Stringer, St. Paul, Minn., for intervening plaintiff Chicago, Rock Island and Pacific R. R. Co.

J. Earl Cudd, Asst. U. S. Atty., for the District of Minnesota, for defendant United States.

Raymond M. Zimmet, Washington, D. C., for defendant Interstate Commerce Commission.

John I. Finsness, Fargo, N. D., for intervening defendants Public Service Commission of the State of North Dakota, Chamber of Commerce of Grand Forks, North Dakota, North Dakota Mill and Elevator Association, North Dakota State Wheat Commission, Board of Trade of Kansas City, Missouri, and Nebraska Consolidated Mills, Co.

Byron D. Olsen and Curtis H. Berg, St. Paul, Minn., for intervening defendant Great Northern Ry. Co.

Howard E. Roos, Omaha, Neb., for intervening defendant Union Pacific R. R. Co.

David C. Priebe, Minneapolis, Minn., for intervening defendant General Mills, Inc.

Before HEANEY, Circuit Judge, and DEVITT and NEVILLE, District Judges.

NEVILLE, District Judge.

Five railroads,[1] operating between Omaha, Nebraska, the Twin Cities (Minneapolis and St. Paul, Minnesota area,) and Chicago, Illinois filed and published tariff schedules, permitting what is called "milling-in-transit" privilege at the Twin Cities for wheat shipped on a through rate of 32.5 cents per cwt. from Omaha to Chicago. The transit privilege permits wheat shipped from Omaha[2] through Chicago to points east of the Illinois-Indiana border under a tariff rate of 32.5 cents per cwt. to Chicago to be stopped and unloaded at the intermediate point of the Twin Cities, and there stored, processed and manufactured into flour. The flour later is shipped on to Chicago without losing the benefit of the 32.5 cents per cwt. through rate. The proportional rate or charge from Omaha

to Minneapolis is 25.5 cents and from Minneapolis to Chicago, 27.5 cents, a total of 53 cents, compared to the through rate from Omaha to Chicago of 32.5 cents, a difference of 20.5 cents per cwt. A similar transit privilege has been in effect for some years affecting some 12 or more flour mills located in cities in Minnesota south of the Twin Cities, the closest being Hastings, Minnesota, 18 rail-miles from the Twin Cities. April 25, 1966 the five railroads petitioned the Interstate Commerce Commission to make this transit privilege effective. The Examiner for the Commission on June 9, 1967, after a rather extensive evidentiary hearing entered an order denying the request on two grounds. He held (1) that the rates applicable under "the proposed milling-in transit privilege are noncompensatory and therefore unjust and unreasonable" under Section 1(5) of the Interstate Commerce Act,[3] and (2) that the proposed tariffs are unduly preferential and prejudicial to millers in Nebraska, Kansas, Missouri, the Dakotas and elsewhere under Section 3 of that Act.[4] He did not find unjust discrimination under Section 2 of the Act.[5] On review of the

---

1. Tariffs in dispute in this case incorporating a transit provision or privilege for Twin Cities were originally published by the Chicago and *North Western* Railway Co.; the Chicago, *Milwaukee*, St. Paul & Pacific Railroad Co.; the Chicago *Great Western* Railway Co.; the Chicago, *Burlington* & Quincy Railroad Co.; and the Chicago, *Rock Island* & Pacific Railroad Co. The Great Western, which has merged with the North Western, and the Burlington, which is involved in merger proceedings with the Great Northern Railway Co. (an intervening defendant) and the Northern Pacific Railway Co., are not intervening plaintiffs before this court.

2. Includes Council Bluffs, Iowa, Sioux City, Iowa, and South Omaha, Nebraska.

3. 49 U.S.C. § 1(5):
"All charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful."

4. 49 U.S.C. § 3(1).
"It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever * * *."

5. 49 U.S.C. § 2.
"If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered, in the transportation of passengers or property, subject to the provisions of this chapter, than it charges, demands, col-

Examiner's Order, the Interstate Commerce Commission (I.C.C.) (Division 2), after a hearing, on February 28, 1968, modified the Examiner's Order, and as so modified, affirmed it, limiting its findings however solely to the "noncompensativeness" of the proposed rates. After petitions for reconsideration had been filed the I.C.C. again affirmed the Examiner's Order. No mention is made by the I.C.C. in either of its orders of alleged discrimination (Sec. 2 of the Act) nor of preference and prejudice (Sec. 3 of the Act). The five railroads were ordered to cancel their schedules permitting the proposed milling-in-transit privilege at the Twin Cities.

May 16, 1968 the above action was filed with this court, brought by two Twin Cities flour millers Archer Daniels Midland Company (ADM) and The Pillsbury Company (Pillsbury) under 28 U.S.C. §§ 1336, 1398, 2284, 2321–2325 and 5 U.S.C. § 551 et seq. against the United States and the I.C.C. to enjoin, set aside and suspend the above orders of the I.C.C. Several of the railroads have intervened as plaintiffs, and some public bodies in North Dakota and Kansas, two milling companies and two additional railroads have become intervening defendants. On May 17, 1968 a judge of this court entered an order that until a three-judge court could be impaneled to hear argument and to make a decision, "the Interstate Commerce Commission is hereby restrained from making effective and enforcing its orders of February 28, 1968 and May 10, 1968." Thus for slightly more than a year as a result of this order the tariffs and schedules containing the milling-in-transit provision at the Twin Cities actually have been in effect

and the railroads, ADM and Pillsbury have been operating thereunder.

For many years the I.C.C. has not allowed railroads to institute milling-in-transit privileges at primary grain markets such as the Twin Cities area. Certain larger centers are designated as "rate break" points, including the Twin Cities. This absolute "rate break" rule was part of the complex grain rate structure devised by the Commission over thirty years ago and approved by the Supreme Court. See Board of Trade of Kansas City, Mo., v. United States, 314 U.S. 534, 62 S.Ct. 366, 86 L.Ed. 432 (1942).[6] The present plaintiffs and the five railroads sought I.C.C. approval of the transit privilege and an order vacating the absolute "rate break" rule. After the Hearing Examiner issued his report but before the I.C.C. itself took any action in this case, the absolute "rate break" rule was vacated by the I.C.C. in Grain and Grain Products, 329 I.C.C. 824 (1967). Thus the present action is concerned only with the transit privilege and whether adequate proof to warrant it has been adduced.

The transit privilege designates the Twin Cities as a transit station on shipments from Omaha and related areas to Chicago or Milwaukee when the shipment ultimately is destined to stations east of the Illinois-Indiana state line. Wheat must be shipped to Minneapolis on which there is then paid the proportional rate from Omaha to Twin Cities of 25.5 cents. The outbound shipment from the Twin Cities can be either flour or wheat, but must be shipped in a minimum of 100,000 pounds per car. At this time an additional 7 cents per cwt. is paid, i. e. the balance of the 32.5 cents through rate, on the

---

lects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful."

6. For a brief history of this grain rate structure, see Omaha Grain Exchange v. Chicago, B. & Q. R. R., 322 I.C.C. 743 (1964), vacated, Chicago, Burlington & Quincy Railroad Co. v. United States, 242 F.Supp. 414 (N.D.Ill.1965), aff'd, 382 U.S. 422, 86 S.Ct. 616, 15 L.Ed.2d 498 (1966).

flour made of Omaha origin wheat. The transit privilege is further subject to several conditions:

1) Only one transit privilege is permitted.

2) Not more than 75 per cent of the weight of each inbound car of wheat may be applied against shipments of flour forwarded under the transit provision.

3) Not more than 50 per cent of the weight of each outbound shipment may be shipped at the transit balance of 7 cents to Chicago. The rest must be shipped at the normal local or proportional rate of 27.5 cents to Chicago.

The effect of the first condition is obvious—transit will be permitted only at the Twin Cities. The second condition reflects apparently the established fact that only 75 pounds of flour can be milled from 100 pounds of wheat. The third condition is the crucial one and will be discussed hereinbelow.

Subject to these conditions, the transit privilege offers the plaintiffs, ADM and Pillsbury, significant savings in shipping costs. They sought that reduction because of changes which they assert have taken place in the milling and baking industry. At one time the large eastern wholesale bakeries received sacked shipments of flour milled from either winter or spring wheat and blended the same by their own recipe at the bakery to achieve flour of the desired characteristics such as protein content and blending qualities.

Particularly with the advent of covered hopper cars which permit bulk shipments of flour, these bakeries began to require flour preblended at the mill. Thus bread flour mills in Minneapolis need not only spring wheat from Minnesota and the Dakotas but also winter wheat from the Omaha market.[7] They claim to need economical access to this winter wheat if they are to remain competitive in the sale of blended bakery flour to the east.[8]

The Commission's finding of noncompensativeness was based on a comparison of the out-of-pocket costs of the Omaha to Minneapolis to Chicago shipment with the revenue to be obtained therefrom. The average cost on the five railroads transporting wheat to Minneapolis and flour to Chicago as calculated by the railroads themselves is 33.5 cents.[9] The Commission compared this cost with the Omaha to Chicago through rate of 32.5 cents and determined that the rate produced by the transit provision was not compensatory.

With the respect to the Commission's determination of the cost of this shipment, we are satisfied that if as a matter of law it used the correct basis for calculating the same there is substantial evidence to support the conclusion reached. See Illinois Cent. R. R. v. Norfolk & West. Ry., 385 U.S. 57, 66, 69, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966). However, the Commission's conclusion that the revenue to be obtained under the transit provision is only the 32.5 cents obtained on the through shipment raises a novel question

7. Heretofore the Minneapolis mills have on occasion found it more economical to ship winter wheat from Chicago up the Great Lakes to Duluth thence by rail to Minneapolis where it is milled and blended into flour and then shipped to Chicago taking advantage of a transit privilege (said to be an exception) which exists from Duluth to Chicago. Otherwise winter wheat has been obtained by more expensive truck transportation to the Minneapolis mills.

8. Apparently ADM and Pillsbury are the only two bread flour mills remaining at Minneapolis. There are none in St. Paul. The Twin Cities milling industry was once the largest in the United States but has now been reduced to but a small fraction of its former size. The number of mills has declined from 8 mills with 101,800 cwt. milling capacity in 1934 to these two mills, with a total capacity of 17,000 cwt., at Minneapolis. In July, 1965 a third company closed its flour mill at Minneapolis.

9. The cost figure varies somewhat if switching costs are calculated on a mileage basis as distinguished from the actual switching costs, and costs are somewhat lower if only boxcars are used for flour shipments as distinguished from hopper cars.

on which neither the plaintiffs nor the Commission has cited any authority directly supporting their respective positions. The plaintiffs cite Razors and Related Articles, Boston, Mass., to Houston, 318 I.C.C. 97 (1962) and Drugs and Related Articles from N.J. and N.Y. to Tex., 318 I.C.C. 67 (1962). These cases hold merely that the compensativeness of an incentive rate cannot be determined by limiting consideration to the excess weight which qualifies for that rate. They do not deal with the issue presented here. The Commission relies on the argument which is summarized below.

The tariff [10] provides that only half of the actual weight of the outbound car may be shipped under the transit provision, that is by paying an additional 7 cents transit balance from Twin Cities to Chicago. The other half, for convenience called the "companion" or "accompanying" shipment, must be paid for at the local or proportional rate of 27.5 cents. This companion flour to be shipped at the local or proportional rate need not be flour milled from Omaha wheat. It appears that all of the flour milled from Omaha wheat could, if properly accompanied, be shipped at the transit balance. The companion flour can be milled from wheat which originates in Minneapolis or the Dakotas or is shipped to Minneapolis from other points.

The plaintiffs present what they claim is in essence a commonsense, businessman's approach to the issue of compensativeness. Their contention is that any shipment under this transit provision will of necessity produce revenue from the Omaha flour and from the accompanying flour; the transit provision otherwise would not be applicable. They argue that the revenue obtained from shipping half a car of companion flour at 27.5 cents must, therefore, be reckoned and added to the 32.5 cents Omaha to Chicago through rate to determine whether this transit provision produces compensatory on noncompensatory rates. If such revenue is considered, it is clear the Commission's conclusion that the rate was noncompensatory would have to be set aside. For example, if 133,334 pounds of wheat (enough wheat to produce 100,000 pounds of flour) were shipped from Omaha to Minneapolis and there milled into 100,000 pounds of flour, and if that 100,000 pounds of flour were shipped to Chicago together with another 100,000 pounds of flour at the proportional rate of 27.5 cents, as the transit provision requires, the total revenue would be $685.[11] This amount far exceeds the cost of this shipment of $502.78 or $566.17 (depending on basis of calculation). Figured on a per hundredweight basis, the revenue the plaintiffs contend is produced is $\frac{25.5 + 27.5 + 7.0}{2}$ or 42.75 cents, in contrast to the cost of 33.5 cents. There is some dispute in the evidence as to whether in determining costs, switching costs should be by actual number or by mileage and whether a calculation should assume shipments of 100 per cent in the more expensive hopper cars or 50 per cent in such cars or even less. In any event, the difference is de minimus compared to total revenue of 42.75 cents, if such is the cor-

---

10. Note 1(c) in the transit provision provides as follows:

"Not more than 50 per cent of the actual weight of each outbound shipment of Flour may be represented by inbound transit billing covering Wheat accorded transit under this Item. The balance of the weight, (including any deficit in the minimum weight), of each outbound shipment of Flour shall be represented by Wheat originating at or beyond Minneapolis, Minnesota Transfer, or St. Paul, Minn., and shall be rated at the local or proportional rate applicable therefrom."

11. Revenue was calculated with reference to the Omaha to Minneapolis proportional rate of 25.5 cents, the transit balance of 7 cents, and the Minneapolis to Chicago proportional rate of 27.5 cents:

| | | | | |
|---|---|---|---|---|
| 133,334 | X | 25.5 | = | $340 |
| 100,000 | X | 7.0 | = | 70 |
| 100,000 | X | 27.5 | = | 275 |
| | | | | $685 |

rect measure. If such not be the correct measure for determining costs, then as against the 32.5 cents through rate, it appears that on a consolidated or averaged basis of all five railroads, costs are 33.5 cents, though two railroads actually show a somewhat lesser figure. Clearly, on a matter this close, the Commission would be confirmed if it had used the proper basis and method for determining compensativeness.

█ We are of the opinion however that the I.C.C. used an improper method in determining compensativeness. In reckoning costs at 33.5 cents, Omaha to Chicago, the Hearing Examiner, whose report was adopted by the Commission, calculated the out-of-pocket cost of the railroads by using $206.12 per box car of wheat, Omaha to Minneapolis, and then the cost of $296.66 for *two* boxcars of flour from Minneapolis to Chicago.[12] Stated another way, the cost of 66,666 pounds of wheat, (which will mill to 50,000 pounds of flour) Omaha to Chicago, is placed at 15.5 cents per cwt., to which is added 18.0 cents per cwt. for 100,000 pounds of flour (two shipments of 66,666 pounds of wheat) Minneapolis to Chicago. As set forth in the Examiner's report:

"* * * *2 carloads are used as a basis for out of pocket costs for moving flour from Minneapolis to Chicago for interchange * * *. Expenses on the outbound movement of flour, include the switching charges of the terminal carriers to deliver *two* carloads of flour in interchange * * *. The foregoing out of pocket costs for the one inbound boxcar of wheat and the *two* outbound boxcars * * *."[13]

It is thus obvious that the Hearing Examiner, affirmed by the Commission, calculated as a part of out-of-pocket costs the cost of the companion or accompanying shipment, but refused to and did not use the revenue derived from the companion shipment. It thus compared things of a different kind. Either the entire revenue should be used including the companion shipment, or the cost figure should be reduced so as to eliminate the cost of shipping the companion flour. One or the other method should be adopted, but not a method which adopts the highest cost figure and the lowest revenue figure. Comparables should be employed.

The plaintiffs characterize the question presented as a matter of tariff interpretation—a question of law for the court. The interpretation of Note 1(c) in the transit provision presents no technical matters and raises no problems in which the expertise of the Commission is paramount. Thus interpreting this tariff would be a question of law upon which a judicial determination could be made. See Calcium Carbonate Co. v. United Statees, 256 F.Supp. 99 (S.D.Ill. 1966); cf. United States v. Western Pac. R. R., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); Great Northern Ry. v. Merchants Elevator Co., 259 U.S. 285, 42 S. Ct. 477, 66 L.Ed. 943 (1922). This court does not hesitate to rule that this transit provision does in fact require concurrent shipments of 50,000 pounds of Omaha flour at the 7 cent transit balance and 50,000 pounds of flour from other sources at 27.5 cents. There is no indication in the record that the Commission thought otherwise.

If the revenue realized from the companion shipment required from Minneapolis to Chicago is to be considered as a part of the gross revenue, the rate is clearly compensatory. We hold that it should be so considered.[14]

---

12. If costs are based on the covered hopper car, the Minneapolis to Chicago costs are higher, i. e. $360.05.

13. See pp. 10 and 11 Report and Order, Recommended by William J. Sweeney Hearing Examiner dated June 9, 1967.

14. We are not here called upon to decide a case where a railroad might attempt to publish a 32.5 cent rate with transit privilege and then require that a like amount of lumber or cattle or some other "companion" commodity be shipped from the transit point to the final point. Flour is

It can be argued that if the companion shipment were to be and would have been made by the Minneapolis mills to Chicago in any event, whether or not matched to or blended with Omaha origin flour, then the tariff and the formula plaintiffs contend for are meaningless. As well add the cost of a car of cattle or of some manufactured product if in fact the non Omaha origin flour were to be shipped by the Minneapolis mills in any event, for such is not newly generated revenue, but merely the adding on of revenue already existing.

If the two remaining Minneapolis mills will be virtually forced to go out of business as plaintiffs seem to contend unless the transit rate requested be permitted— in which event shipment of the non Omaha origin flour would cease from the two Minneapolis mills—or if a substantial increase occurs in companion shipments of non Omaha origin flour over and above historical amounts due to the transit privilege such facts might serve as an answer to the above argument.[15] Additional evidence would have to be adduced in order that the court would be able to rule on these questions. This line of reasoning however really begs the question in this case. The fallacy lies in the fact that whether or not the companion shipments would be made in any event, or whether or not the transit privilege increases or has increased the amount of companion shipments over those in the past, in calculating compensability both the costs and the revenue therefrom, or else neither, should be taken into account. The fact is that if one takes the cost from Omaha to the Twin Cities at 15.5 per cwt. for 66,666 pounds of wheat in a boxcar and the cost at 9 cents from Minneapolis to Chicago of a

50,000 pound car of flour milled from such wheat, the total cost is 24.5 cents against revenue of 32.5 cents or a net revenue of 8 cents. This is clearly compensable. But, if one takes the same 15.5 cents Omaha to Minneapolis cost and then adds 2 cars of 50,000 pounds each to Chicago at 9 cents each, a total of 18 cents—then one gets a total cost of 33.5 against a revenue of 32.5. This rather clearly is noncompensable. This latter is what the Commission did. But, as seems proper, when the revenue from the second car concerning which the costs have now been included is added, total revenue substantially exceeds the 33.5 cent cost. It would thus seem immaterial whether or not the companion shipments would have been made without the transit privilege or would be increased with such, for in any event, either the revenue from the companion shipment should be included or the cost thereof not included.

■ The real question presented in this case is not simply a matter of tariff interpretation. This court is asked to rule as a matter of law that the Commission must consider the revenue obtained from the companion flour shipped at 27.5 cents in determining whether the transit provision produces just and reasonable rates under Section 1(5) of the Interstate Commerce Act. Determination that a given rate is unjust or unreasonable is a matter primarily for the judgment and consideration of the Commission and judicial review of the Commission's determination is severely limited. See ICC v. Atlantic Coast Line R.R., 383 U.S. 576, 592–593, 86 S.Ct. 1000, 16 L.Ed.2d 109 (1966); Mississippi Valley Line Barge Co. v. United States, 292 U.S. 282, 286– 287, 54 S.Ct. 692, 78 L.Ed. 1260 (1934); ICC v. Illinois Cent. R.R., 215 U.S. 452,

---

homogeneous, and in fact is blended at the mill. This then is not a situation where a railroad might be requiring a tie-in of some completely non-compatible, nonblended, generically different product. This court can see no legal difficulty with the present published tariff on this ground.

15. Plaintiffs for instance cite that the Southern Minnesota mills suffered a decline in milling capacity of 58.6 per cent from 1934 through 1959. The advent of the transit privilege reversed the trend and in 1965 the milling capacity of these mills had increased by 9 per cent over 1959.

470, 30 S.Ct. 155, 54 L.Ed. 280 (1910); Pennsylvania R. R. v. United States, 315 F.2d 460, 465 (3d. Cir.), cert. denied, 375 U.S. 814, 84 S.Ct. 47, 11 L.Ed.2d 50 (1963); Atchison, T. & S. F. Ry. v. United States, 282 F.Supp. 430, 434 (D.Kan. 1968). The ruling in question, then, must be sustained unless the Commission erroneously applied a rule of law or there was no substantial evidence to sustain the Commission's conclusion. We believe the Commission erred.

As stated before, the situation in this case is somewhat unique in that there is now available over a year's experience of operation under the transit privilege. Additional evidence in the light of actual experience to determine the volume of transit shipments, actual costs rather than the projected costs now in the record and any other matters bearing on the issues might be of value.

The Commission based its order solely on "noncompensativeness" and made no finding on the charge of discrimination under Sec. 2 of the Interstate Commerce Commission Act, though the Hearing Examiner had found none to exist, and made no finding on the charge of preference and prejudice under Sec. 3 of the Act, which the Hearing Examiner found did or would exist. Since this court has set aside the Commission's finding of "noncompensativeness," a finding might be made by the Commission on the Sec. 2 and Sec. 3 claimed violations, particularly with new evidence in the light of what will be a year to a year and one-half operations experienced under the transit privilege.

Accordingly, the orders of Division 2 of the Interstate Commerce Commission dated February 28, 1968 and May 10, 1968 are vacated and the case is remanded to the Interstate Commerce Commission for such further proceedings as it may determine in accordance with and not inconsistent with the views expressed in this opinion.

So ordered.