557 F.2d 775
 MOBIL ALASKA PIPELINE COMPANY, Petitioner,
v.
UNITED STATES of America and the Interstate Commerce
Commission, et al., Respondents,
and
Sohio Pipe Line Company, Amerada Hess Pipeline Corporation,
Union Alaska Pipeline Company, Intervening Petitioners,
State of Alaska and Arctic Slope Regional Corporation,
Intervening Respondents.
BP PIPELINES INC., Petitioner,
v.
UNITED STATES of America and the Interstate Commerce
Commission, Respondents.
EXXON PIPELINE COMPANY, Petitioner,
v.
UNITED STATES of America and the Interstate Commerce
Commission, Respondents,
and
Union Alaska Pipeline Company, Intervening Petitioner.
ARCO PIPE LINE COMPANY, Petitioner,
v.
UNITED STATES of America and the Interstate Commerce
Commission et al., Respondents,
State of Alaska, Intervening Respondent.
 Nos. 77-2392, 77-2412, 77-2421 and 77-2437.
 United States Court of Appeals,
Fifth Circuit.
 July 29, 1977.
 
 Andrew J. Kilcarr, Washington, D. C., Maureen O'Bryon, James R. Kinzer, Gen. Counsel, Mobil Alaska Pipeline Co., Dallas, Tex., John Lansdale, Jr., Cox, Langford & Brown, Washington, D. C., for Sohio.
 Rush Moody, Jr., Washington, D. C., for Amerada Hess.
 Kenneth L. Riedman, Jr., Los Angeles, Cal., for Union Alaska.
 Griffin B. Bell, Atty. Gen., U. S. Dept. of Justice, Washington, D. C., Mark L. Evans, Gen. Counsel, Interstate Commerce Commission, Washington, D. C., Charles H. White, Jr., Assoc. Gen. Counsel, Donald A. Kaplan, Atty., Anti-Trust Div., Dept. of Justice, Washington, D. C., Robert Lewis Thompson, John J. Powers, III, Attys., Appellate Section, Dept. of Justice, Washington, D. C., for respondents.
 O. Yale Lewis, Jr., Seattle, Wash., for Arctic Slope.
 John M. Cleary and Edward J. Twomey, Donelan, Cleary, Wood & Maser, Washington, D. C., for State of Alaska.
 Paul M. Haygood, New Orleans, La., Richard J. Flynn, Lee A. Monroe, Joseph B. Tompkins, Jr., Washington, D. C., Frank L. Heard, Jr., Houston, Tex., B. J. Caillouet, New Orleans, La., Kenneth L. Riedman, Jr., Los Angeles, Cal., for Union Alaska.
 William R. Connole, Quinn O'Connell, Eugene E. Threadgill, Washington, D. C., Marvin Schwartz, Michael Winger, New York City, Jack Vickrey, Houston, Tex., Glen E. Taylor, George H. Hagle, San Francisco, Cal., for petitioner.
 Robert E. Jordan, III, James H. Pipkin, Steven H. Brose, Michael P. Berman, Washington, D. C., John T. Updegraff, Independence, Kan., for petitioner.
 On Petitions to Review an Order of the Interstate Commerce Commission.
 Before BROWN, Chief Judge, GODBOLD and RONEY, Circuit Judges.
 PER CURIAM:
 
 
 1
 Four petitions seeking injunctive relief and review of a June 28, 1977 Order of the Interstate Commerce Commission are before us, together with the United States' motion to dismiss.[1] For reasons discussed below, we grant the government's motion.
 
 Background Of The Case
 
 2
 This controversy arose on the eve of the flow of crude oil through the Trans Alaska Pipeline System (TAPS)[2] which stretches from oil fields in Alaska's North Slope at Prudhoe Bay to Valdez, Alaska, some 800 miles distant. The pipeline was constructed by the Alyeska Pipeline Service Corporation, an agent for its eight owners.[3]
 
 
 3
 Between May 27, 1977 and June 15, 1977, seven TAPS owners filed the tariffs[4] which are at issue here,[5] having effective dates ranging from June 20 to July 1, 1977. Protests were filed by the Department of Justice, the State of Alaska,[6] the Arctic Slope Regional Corporation,[7] and the ICC's Bureau of Investigations and Enforcement. The Commission heard oral argument on June 27, 1977[8] without making any formal evidentiary record.8a
 
 
 4
 The ICC's June 28 Order[9] instituted an investigation into the lawfulness of the tariffs pursuant to 49 U.S.C.A. §§ 15(1)[10] and 15(7).[11] The rates filed were suspended for seven months without prejudice to the filing of interim rates during the suspension period. The Commission additionally authorized the filing, upon not less than one day's notice, of interim rates which were not to exceed certain levels, subject, however, to the condition that the carriers keep account and that (i) the interim tariffs contain a refund provision to the effect that if the new rates exceed those subsequently authorized or prescribed by the ICC, the carriers will refund the excess with interest; and (ii) the carriers file a similar refund provision applicable to the original proposed rates. The Order thus had the following effect on the carriers' proposed rates per barrel:
 
 
 5
 The carriers estimate that the Order will result in an irretrievable $340 million loss over the seven-month suspension period.
 
 
 6
 The suspension left the pipeline companies without tariffs on file, and they are forbidden by § 6(7) of the Act to engage or participate in the transportation of oil unless they file new tariffs. The carriers thus had two alternatives open to them. They could file new tariffs within the ICC guidelines or they could shut down the TAPS system for the seven-month suspension period. Unhappy with either choice, the pipeline companies filed their petitions and motions and the United States moved to dismiss.[13] This Court heard oral argument on July 19, 1977.
 
 
 7
 The major issues raised by the parties are (i) whether we have jurisdiction to review the ICC order; (ii) whether the Commission has the authority under 49 U.S.C.A. § 15(7) to suspend the first and only ("initial") rate of a carrier; (iii) whether as part of a purported suspension order the ICC may prescribe or suggest optional maximum interim rates; (iv) whether the ICC's order authorizing the filing of maximum interim rates without a full hearing amounted to a prescription of rates within the meaning of 49 U.S.C.A. § 15(1); (v) whether the Commission acted outside its statutory authority in ordering the refund provisions in the tariffs; (vi) whether the Commission's action was arbitrary, capricious or constituted an abuse of discretion; (vii) whether the maximum interim rates authorized were confiscatory in violation of the Fifth Amendment.
 
 
 8
 1. Reviewability and the authority of the Commission
 
 
 9
 The government has moved to dismiss the petitions for review on the ground that this court has no jurisdiction to review suspension orders of the ICC issued pursuant to 49 U.S.C.A. § 15(7). True, courts do not have jurisdiction to review ICC suspension orders. Congress has committed the decision to suspend or not to suspend proposed rates exclusively to the discretion of the Commission. U. S. v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); Arrow Transportation Co. v. Southern Railway Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963); K. Davis, ADMINISTRATIVE LAW TREATISE 966 (1970 Supp.). As a panel of this circuit noted:
 
 
 10
 The Interstate Commerce Commission . . . is vested with power to suspend, at its discretion, for a period of seven months, rates filed with it pending hearing and decision on their lawfulness. 49 U.S.C. § 15(7). The existence of this power in the ICC, it has been held, evinces the deliberate decision of Congress to extinguish judicial power to grant any injunction which interferes with the Commission's discretionary decision to suspend rates filed with it at anytime before the Commission finally determines the lawfulness of the rates.
 
 
 11
 Texas v. Seatrain International, 518 F.2d 175 at 178 (CA5, 1975). But the rule of unreviewability presupposes an affirmative answer to a preliminary inquiry into whether the Commission has acted within the authority granted to it by § 15(7). A suit to enjoin a suspension order may be entertained if the complaint shows that the agency lacked the basic statutory authority to issue such an order. Great Western Packers Express, Inc. v. U. S., 246 F.Supp. 151, 154 (D.Colo., 1965) (three-judge court); Long Island Railroad Co. v. U. S., 193 F.Supp. 795, 800 (E.D.N.Y., 1961) (three-judge court).
 
 
 12
 Section 15(7) gives the ICC the power to suspend "any schedule stating a new individual or joint rate, fare, or charge, or any new individual or joint classification, or any new individual or joint regulation or practice affecting any rate, fare, or charge" for a period not to exceed seven months, and to order an investigation and full hearings on those new charges. The above language has no plain meaning. The term "new" can refer to both changed and initial rates or only to changed rates. The statutory history of the Mann-Elkins Act (1910), which added § 15(7) to the Interstate Commerce Act, yields little insight on whether the ICC is empowered to suspend initial rates since no one seems to have debated or even discussed this specific question. However, our examination of statutes modeled on § 15(7) and of the legislative policy underlying that section convinces us that it was Congress' intention that the Commission have the power to suspend initial as well as changed rates.
 
 
 13
 Section 15(7) has served as the prototype of other agency rate suspension provisions in the Interstate Commerce Act and in other regulatory acts as well. In many of these acts, when Congress has wished to exclude initial rates, either in part or across the board, it has done so in specific language. In the Interstate Commerce Act itself, there are provisions modeled on 49 U.S.C.A. § 15(7) giving the ICC authority to suspend new rates, proposed by motor carriers, 49 U.S.C.A. § 316(g), by water carriers, 49 U.S.C.A. § 907(g)(i), and by freight forwarders, 49 U.S.C.A. § 1006(e). Each of these provisions contains a grandfather clause exempting certain initial rates from suspension. If initial rates were not covered there would have been no need for the grandfather clauses. Another example is 49 U.S.C.A. § 1482(g), which gives the Civil Aeronautics Board suspension powers similar to those granted to the ICC with one significant difference: it specifically provides that "(t)his subsection shall not apply to any initial tariff filed by any air carrier." Thus, we conclude that if Congress had wished to exempt initial tariffs from the purview of § 15(7) it would have done so specifically, and that Congress' omission to specially exempt initial rates in this section indicates its intent that initial rates be subject to the ICC's § 15(7) suspension powers.
 
 
 14
 The conclusion that initial rates are covered by § 15(7) is consistent with the legislative policy underlying that section. Section 15(7) evidences a belief on the part of Congress that the normal hearing and reparation processes of the ICC are not sufficient to protect the public against potentially excessive charges. The need for this protection is no less in the case of initial rates than in the case of changed rates. Absent a specific legislative decision that initial rates are not covered, it would be illogical to assume that Congress intended to leave such a gap in the legislative scheme.
 
 2. The suggested interim rates
 
 15
 The petitioners challenge the action of the Commission with respect to suggested interim rates. They point out that § 15(7) contains no provisions for establishing interim rates and that, in any event, rates can only be prescribed after full hearings. See 49 U.S.C.A. § 15(1). The Commission's position is that it has not actually fixed a rate but, in a situation of urgent national interest and as an incident of its power to suspend, it has given advance indication of the maximum rates with respect to which if the carriers elect to file them the Commission will not exercise its power to suspend.
 
 
 16
 The Commission Order refers to "interim rates," but baldly describing the issue as the power of the Commission to set interim rates is misleading. As we have held, the Commission had the power to unconditionally suspend the proposed tariffs, leaving the carriers without any tariffs but free to file new tariffs if they wished, which would be subject to new exercise of the Commission's power to suspend. The ICC chose not to exercise to its full limits the drastic but available power of unconditional suspension and instead announced that if petitioners would file interim tariffs at or below Commission-announced ceilings the Commission would not unconditionally suspend the tariffs originally filed.
 
 
 17
 The petitioners maintain that the § 15(7) power to suspend is an all or nothing instrument. We think not. The Commission may elect to exercise its power less than fully, or putting it another way, may partially waive the suspension power. We are guided by the Supreme Court's decision in U. S. v. Chesapeake & Ohio Railroad Co., 426 U.S. 500, 96 S.Ct. 2318, 49 L.Ed.2d 14 (1976) ("Chessie "). In Chessie the ICC suspended a carrier-proposed tariff increase but at the same time authorized the railroads to refile, incorporating conditions which would assure that the additional revenue would be expended on capital improvements and deferred maintenance. The Supreme Court upheld the refiling provision as directly related to the ICC's suspension power. The Court noted that the ICC could simply suspend the originally proposed rates for the full statutory seven-month period but that instead "it pursued a more measured course and offered an alternative tailored far more precisely to the particular circumstances presented." 426 U.S. at 514, 96 S.Ct. at 2325, 49 L.Ed.2d at 23. Chessie establishes the right of the ICC to choose to exercise its suspension power to less than its outer limits in order to meet the needs of a particular situation. The ICC's authorization to file interim rates was the type of "more measured course" or partial waiver which the Supreme Court approved in Chessie.
 
 
 18
 Moss v. CAB, 430 F.2d 891 (C.A.D.C., 1970), relied on by the petitioners, is not to the contrary. In Moss the Court of Appeals for the District of Columbia held that the Civil Aeronautics Board (CAB) could not, after ex parte meetings with the air carriers, "suggest" a comprehensive rate formula that it would not suspend or investigate. Moss involved what for all intents and purposes was the establishment of permanent rates. By attempting to establish a permanent rate structure through its suspension power the CAB took actions which went beyond the strongest action it could have taken under its suspension power, i. e., suspending the proposed increases for 180 days. 49 U.S.C.A. § 1482(g). In essence what the CAB attempted to do in Moss was to waive a right it did not have. In contrast, the ICC's suggestion of interim rate ceilings in the present case is an action which is more restrained, or measured, than its right to unconditionally suspend the original tariff for a period of seven months. If in seven months the ICC has not completed its investigation, the carriers will be free to levy their originally filed charges subject to a refund order.
 
 
 19
 Also, in Moss the practical effect of the CAB's actions would have been to immunize the suggested permanent rate structure from judicial review.[14] In the present case the ICC has not sought to shield its final decision from judicial review. Instead the Commission has commenced hearings on the original rates proposed by the petitioners, and any eventual final order stemming from those hearings is subject to judicial scrutiny.
 
 
 20
 In a case involving initial rates, if the ICC could not couple its suspension order with a statement of maximum allowable interim ceilings, the Commission would be forced to allow initial rates to go into effect, even if facially outrageous, subject only to lengthy investigation and hearing procedures, or to watch a possibly vital public service close down for want of a rate schedule. We doubt the Congress would have intended that the Commission face that Hobson's choice.
 
 
 21
 The use of interim rates as a condition to a suspension order is not unprecedented. In I & S Docket No. 8645, Orders (May 27, 1971, and June 29, 1971) the Commission ordered that increased lighterage charges proposed by the Penn Central Railroad be suspended but allowed the company to file interim rates containing additional charges not to exceed 50% of those initially proposed. The ICC's orders also required that Penn Central maintain an account from which refunds could be made to the extent that the proposed tariffs could not be justified to the Commission. In Port of New York Authority v. U. S., 451 F.2d 783, 785-88 (CA2, 1971), the Second Circuit held that the Order was unreviewable and that federal courts lacked subject matter jurisdiction over an action challenging the Order.
 
 
 22
 We conclude that the ICC as corollary to its suspension power had the power to set out allowable rate ceilings for the seven-month period which, if filed, it would not suspend. Therefore, this aspect of its Order is not reviewable by this court.
 
 3. The refund provisions
 
 23
 As a condition precedent to the interim rates which the Commission stated it would accept, the Commission required the carriers to establish refund provisions for use in the event that either the interim rates or the originally filed tariffs[15] or both should be found to be excessive.
 
 
 24
 With respect to this exercise of power for the seven-month period, like the power to suggest the interim rates themselves, we find this is a valid corollary to the suspension power, which we lack jurisdiction to review. See Port of New York Authority v. U. S., supra. We are less certain of the Commission's power to require the carriers to establish refund provisions with respect to the originally filed rates. However, we view this exercise of power as corollary to the power to suspend. Thus, insofar as the Commission's order reaches beyond the seven-month period, we are guided by Chassie, where the condition upheld by the Supreme Court was permanent.[16]
 
 4. Arbitrariness and confiscation
 
 25
 The petitioners assert that the Commission action was an abuse of discretion and that the interim rate ceilings are so grossly insufficient that they are confiscatory in violation of the Fifth Amendment. Restating, we understand these contentions to be that even if the Commission is authorized by § 15(7) to act with respect to the subject matter, its exercise of power departed from constitutional standards. Assuming that we can review the Commission Order through these constitutional entry points the record before us gives no basis upon which we can act.
 
 
 26
 All motions to intervene are GRANTED. All motions for stay, suspension, injunction and other forms of interlocutory relief are DENIED. The motion of the United States to dismiss the petitions for review is GRANTED.
 
 RONEY, Circuit Judge, dissenting:
 
 27
 I respectfully dissent. The thesis of the Commission is that it has the unreviewable authority to suspend the pipeline's initial rate filing and, as an adjunct of that authority, it has the power to fix an unreviewable interim rate for the seven month period. The idea that the Commission can set an unreviewable rate without following the statutory ratemaking procedures runs counter to the entire plan established by Congress in the Interstate Commerce Act.
 
 
 28
 This is ratemaking. We should not hide from that fact. The Commission candidly admits that it is making an interim rate. To suggest that the rate is "voluntary," that no rate has been set by the Commission because theoretically the pipeline companies could accept the seven month stay and not file for the interim rate, exalts form over substance in a way rarely countenanced by this Court. The Court, the Commission, the pipeline companies, and all parties to this proceeding know that an interim rate will have to be accepted by the respondents. Without a filed tariff, no oil can flow. No one has made the slightest suggestion in brief or oral argument that it would be either in the public or private interest for the transportation of this oil to be suspended for seven months while the Interstate Commerce Commission determines whether or not the proposed tariff is reasonable and just. See 43 U.S.C.A. § 1651 (Supp.1977). We are given to understand that the rate here under consideration does not affect the price of oil at the delivery point, or the eventual price to the consuming public. Any transportation cost adjustment affects only the wellhead price of oil. Although there is almost complete identity between the affiliates which own the pipeline and those who receive the wellhead price, there are some others involved, and the royalty to the State of Alaska and property owners varies with the wellhead price.
 
 
 29
 The argument that this is not ratemaking because it is only an interim and not a permanent rate loses force in numbers. The pipeline companies claim the difference between what they should get and what they will get under the interim rate could amount to $340,000,000. This sum is undoubtedly greater than the amount at stake in many permanent rates subject to ICC approval.
 
 
 30
 Although Arrow Transportation Co. v. Southern Ry., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963), and United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), are cited for the proposition that the grant or denial of a suspension order is not reviewable, they in fact only hold that a court has no authority at all to suspend a rate and that an ICC refusal to suspend is not reviewable under any statutory standard. They do not hold that a suspension order is unreviewable under constitutional due process standards. I would think that a suspension order in this case, where the lack of any tariff would effectively close down the Alaska Pipeline for seven months, and would eliminate any method of transporting the oil from the Alaska oil fields for that period of time, would be reviewable on a constitutional due process standard.
 
 
 31
 We are not confronted, however, with just a suspension order. The order before us is schizophrenic. It is both a suspension order and a ratemaking order.
 
 
 32
 This is a situation never previously confronted by the courts. In most situations, if a new rate is submitted to the ICC and the agency chooses to suspend it, this merely means that the carrier involved will continue to charge the rates already in existence. Thus the ICC need not take further action to ensure that the carrier can stay in business and collect charges that at least at one time were assumed to be reasonable, during the seven month period. Here, however, the Commission was faced with a brand new entity. The Trans-Alaska Pipeline System had no preexisting rate schedule when it filed its "new" rate with the ICC. Thus, after deciding to suspend the filed rate, the ICC was faced with a situation which left no legal rate in effect for the seven month period. Unwilling to allow the pipeline to shut down, the Commission had to promulgate what is a "second" order, a ratemaking order.
 
 
 33
 Rate setting orders are clearly reviewable under the statute. Therefore I would not review the possible legality of just a suspension order here. I would accept this case for what it is: an attempt by the Commission to do two things, the first of which it would not do had it not the power to do the second. There is no indication in anything before us that the Commission would suspend the proposed tariff if it could not set an interim rate. Thus I would not reach the constitutional considerations that might demand review of a suspension order alone in this unique situation. There is no indication that the Commission would follow such a course. Its claimed authority to do so becomes merely the theoretical exercise of power onto which it hangs its ability to set an interim rate.
 
 
 34
 So I would assume without deciding that the Commission has the power to suspend the initial rate and go to the question of whether it can set the interim rate in the manner done here. If the interim rate cannot stand, I would send the case back to the Commission for whatever action it wishes to take within the confines of its legal authority. If it chooses to suspend without an interim rate, then on review a court could consider whether that action alone under the circumstances of this case can withstand the due process requirements of the Constitution. Or, if it chooses to arrive at some interim rate through procedures that have some resemblance to the ratemaking procedures which Congress has required, that too could be reviewed. However, I do not think that in order to decide the case before us we need to make any definitive decision as to whether an initial rate suspension alone, under the facts of this case, would be legal, or whether the Commission can ever set interim rates in connection with a rate suspension. All I would now hold is that the Commission has no authority to do what it did here.
 
 
 35
 United States v. Chesapeake & Ohio R. R., 426 U.S. 500, 96 S.Ct. 2318, 49 L.Ed.2d 14 (1975), is the only controlling authority relied upon for the proposition that interim ratemaking is a necessary power under the suspension authority. In deciding that interim ratemaking is unreviewable, the majority opinion completely overlooks the fact that the Supreme Court considered the "conditions" imposed on the proposed tariff there to be reviewable.
 
 
 36
 In this Court, Chessie has argued that . . . the application of the Commission's action to it is arbitrary and capricious. . . . Since the District Court held that the Commission did not have the power to impose conditions on the refiling of the tariff, it did not address this question. Chessie, if it chooses, may raise the matter on remand in the District Court.
 
 
 37
 426 U.S. at 515, 96 S.Ct. at 2326. To distinguish the point on the ground that in Chessie, the rate was permanent, must also distinguish the case beyond support for the proposition espoused in the case at bar.
 
 
 38
 This case is factually and legally different from Port of New York Authority v. United States, 451 F.2d 783 (2d Cir. 1971), relied upon by the majority. There the initial decision had been made to suspend the effective date of the proposed increase in tariffs. There was a tariff in effect after suspension, one which had already been determined to be reasonable either through Commission action or lack of complaint. The suspension order was concededly within the sole discretion of the Commission, and all that was involved was timing. The Commission offered to let the carrier collect an interim increase, if it chose to do so. For two reasons that case is not helpful here.
 
 
 39
 First, in that case, there was a good faith suspension order of the rate increase which did not cut off services. Here there is no indication that the Commission would suspend the tariff and consequently cause a seven month delay in service. In fact, we are told that in oral argument before the Commission, the director of the Commission's Bureau of Investigation and Enforcement indicated the owners of the pipeline might be subject to civil or criminal penalties if they did not file for these "voluntary" interim rates. Such a view would dispel any thought that the public interest required a rate suspension. This is pointed out not to suggest that a suspension order would be reviewable under the statutory public interest standard, but only to emphasize that the Commission has made no such decision upon which to hang the Port of New York Authority holding.
 
 
 40
 Second, the pipeline companies' choice is not whether to adhere to present rates for seven months, or accept an interim increase, as was the case in Port of New York Authority, but whether not to do business at all, or accept an interim rate. This does not make acceptance or rejection of the interim rate the viable choice that was available in that case.
 
 
 41
 The interim rate being reviewable, the next question is whether it can stand. Even if the Commission is permitted some leeway, and allowance is made for the fact that it "pursued a more measured course and offered an alternative tailored far more precisely (than a simple suspension) to the particular circumstances presented," Chessie, 426 U.S. at 514, 96 S.Ct. at 2325, the manner of arriving at the interim rate was beyond the most liberal reading of its statutory authority.
 
 
 42
 Congress has set well-established limits on the ICC's power to make rates. First, historically, the ICC did not have ratemaking power. It could set aside a rate as being unreasonable, but the Supreme Court found no implied power to set a reasonable rate. ICC v. Cincinnati, New Orleans & Texas Pacific Ry., 167 U.S. 479, 17 S.Ct. 896, 42 L.Ed. 243 (1897). Only nine years later did Congress amend the Act to give the ICC power to set maximum rates, Act of June 29, 1906, ch. 3591, § 4, 34 Stat. 589, and not until 1920 was it given power to set minimum rates, Act of Feb. 28, 1920, ch. 91, § 418, 41 Stat. 484.
 
 
 43
 Second, the ICC has the power to set rates only after it has determined that a proposed rate is unreasonable. That principle has been reiterated in several cases which indicate that it is the carriers who have the right to propose initial rates. ICC v. Louisville & Nashville R. R., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431 (1913) ("Under the statute the carrier retains the primary right to make rates, but if, after hearing, they are shown to be unreasonable, the Commission may set them aside and require the substitution of just for unjust charges. The Commission's right to act depends upon the existence of this fact, and if there was no evidence to show that the rates were unreasonable, there was no jurisdiction to make the order." 227 U.S. at 92, 33 S.Ct. at 187). See also New York v. United States, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947); United States v. Illinois Central R. R., 263 U.S. 515, 522, 44 S.Ct. 189, 68 L.Ed. 417 (1923); Southern Pacific Co. v. ICC, 219 U.S. 433, 31 S.Ct. 288, 55 L.Ed. 283 (1911); ICC v. Chicago Great Western Ry., 209 U.S. 108, 118-119, 28 S.Ct. 493, 52 L.Ed. 705 (1908).
 
 
 44
 Third, a proposed rate can be found unreasonable only after a full hearing. Atchison, Topeka & Santa Fe Ry. v. United States, 284 U.S. 248, 262, 52 S.Ct. 146, 150, 76 L.Ed. 273 (1932) ("The legal standards governing the action of the Commission in determining the reasonableness of the rates are unaltered. In the discharge of its duty, a fair hearing is a fundamental requirement.") The courts have consistently held that a finding by the ICC of unreasonableness of the rate proposed by the carrier must be supported by substantial evidence on the record as a whole. Atchison, Topeka & Santa Fe Ry. v. Wichita Board of Trade, 412 U.S. 800, 806, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); Western Paper Makers' Chemical Co. v. United States, 271 U.S. 268, 271, 46 S.Ct. 500, 70 L.Ed. 941 (1926); Skinner & Eddy Corp. v. United States, 249 U.S. 557, 562, 39 S.Ct. 375, 63 L.Ed. 772 (1919); Archer Daniels Midland Co. v. United States, 301 F.Supp. 328 (D.Minn.1969) (3-judge court); Atchison, Topeka & Santa Fe Ry. v. United States, 282 F.Supp. 430, 434 (D.Kan.1968) (3-judge court).
 
 
 45
 Last, the ICC can establish a rate only after a full evidentiary hearing. Atchison, Topeka & Santa Fe Ry. v. United States, 284 U.S. 248, 262, 52 S.Ct. 146, 76 L.Ed. 273 (1932); ICC v. Louisville & Nashville R. R., 227 U.S. 88, 93, 33 S.Ct. 185, 57 L.Ed. 431 (1913). That hearing requirement is not satisfied by the "brief and informal hearing" which accompanies a suspension order. Arrow Transportation Co. v. Southern Ry., 372 U.S. 658, 672, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963). The case for strict enforcement of the hearing requirement is particularly strong because this rate applies to so few companies, and the administrative inconvenience of multiple parties which sometimes justifies lowered procedural standards is not present. Compare Londoner v. Denver, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908) (individual property assessment without hearing invalid) with Bi-Metallic Investment Co. v. State Board of Equalization, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915) (city-wide revaluation does not require individual adjudication). Even in the multi-party rate cases administrative hearings have withstood attack only when the agency granted adequate notice and opportunity to comment both on the original rate proposal and on the comments made by others. See Shell Oil Co. v. FPC, 520 F.2d 1061, 1074-1076 (5th Cir. 1975), cert. denied sub nom., California Co. v. FPC, 426 U.S. 941, 96 S.Ct. 2660, 49 L.Ed.2d 394 (1976).
 
 
 46
 In this case where is the finding of unreasonableness of the proposed rate on an evidentiary record, and where is the record to support the interim rate? The Commission readily admits that it cannot support either finding by record evidence.
 
 
 47
 But procedural unfairness is only the beginning of the arbitrariness in this case. The real difficulty, and the problem that makes the procedural shortcuts so detrimental to the petitioners, is that Congress through the Act has provided a reasonable way to protect all parties in this proceeding against the effect of error in the proposed rate, but the Commission has, without offer of justification, ignored it in the proposed interim tariff. If the rate is determined to be too high, the carriers may be forced to refund, with interest, 49 U.S.C.A. § 15(7) (Supp.1977), or pay back as damages, with costs and attorneys' fees, 49 U.S.C.A. § 8, an overcharge collected prior to rate determination. In other words, the parties overcharged can be made whole. If the interim rate is too low, however, the ICC program provides no means whatsoever for the pipeline to recover the difference between what it was required by the Government to charge, and what that same Government later decides would have been a reasonable rate. To have a way to protect all interests, and not take it, and subject one party to the possibility of irreparable loss, is impermissible under even the most deferential standard of judicial review.
 
 
 48
 The complainants argue that a system of refunds would produce justice at the price of delay. Even justice delayed, however, is preferable to justice forever denied. At oral argument, Commission's counsel suggested no harm had been done because the interim rate is the highest rate that could reasonably be established for the pipeline. That statement constitutes a gross prejudgment of what the ICC will do, and overlooks entirely the reviewable nature of the Commission's ultimate ratemaking action. Without a sufficient record to support a finding of anything at all, and with serious questions about the rate of return, the treatment of inflation, and allowances for depreciation, counsel would have this Court predict what Commissioners, who may not be in office now, will do on the evidence presented them, and what a court of judges, who may not be in office now, will do on review of whatever those Commissioners do.
 
 
 49
 Nor can this Court sustain the interim rate by obeisance to the expertise of the Commission. Only after a full hearing upon complaint made does the law give weight or significance to the opinion of the Commission. Atlantic Coast Line R. R. v. ICC, 194 F. 449 (Commerce Ct. 1911). The expertise of the Commission can only be relied upon after it has exercised its expert judgment on the record before it. See Pedersen, Formal Records & Informal Rulemaking, 85 Yale L.J. 38 (1975).
 
 
 50
 Hence I would hold that the Commission had no authority to set in the way it did the interim rate which was forced upon the carriers. I would set aside that proposed interim rate for these reasons: first, the Commission did not even attempt to follow congressionally mandated procedures for setting rates; second, without some specific finding of unreasonableness in the proposed rate, it appears arbitrary not to follow the statutory plan by which all parties could be protected against any eventual rate determination, and to follow a course which would cause irreparable damage to the pipelines if their position is eventually sustained; third, the interim tariff itself appears to be based on a rate of return more akin to that of corporate bonds than to the speculative risks of equity capital, a rate arrived at without sufficient supportive evidence concerning the speculative nature of these investments or the appropriate rate therefor.
 
 
 51
 I would set aside the Commission's Order of June 28, 1977, and remand the case to the Commission for further consideration consistent with its statutory authority.
 
 
 
 [1]
 No. 77-2392, Petition of Mobil Alaska Pipeline Company (Mobil) to Annul, Set Aside and Enjoin Enforcement of an Order of the Interstate Commerce Commission and Applications and Motions for Temporary Restraining Order and Interlocutory Injunction. The respondents in this case were the United States, the Interstate Commerce Commission (ICC or Commission) and the latter's individual Commissioners. The State of Alaska moved to appear as a party. The Arctic Slope Regional Corporation moved to intervene. Both opposed Mobil's petition. Sohio Pipe Line Company moved to appear as a party in support of Mobil's petition, as did Amerada Hess Pipeline Corporation. Union Alaska Pipeline Company moved to appear as a party
 No. 77-2412, Petition to Enjoin, Set Aside, Suspend and Review Order of the Interstate Commerce Commission and Motion to Stay, Restrain and Suspend Order of the Interstate Commerce Commission filed by BP Pipelines, Inc. (BP), naming the United States and the ICC as respondents.
 No. 77-2437, Petition for Review and Application for Interlocutory Injunction filed by Arco Pipe Line Company (Arco). The United States, the ICC and its individual Commissioners were named as respondents. Alaska also sought leave to appear as a party in opposition to Arco's petition.
 No. 77-2421, Petition for Review and Motion for Expedited Consideration or, in the Alternative, for a Stay Pending Review, filed by Exxon Pipeline Company (Exxon), naming the ICC and the United States as respondents. Union Alaska Pipeline Company moved to appear as a party.
 The United States moved for consolidation and to dismiss. The motion for consolidation was granted from the Bench during oral argument on July 19, 1977. The court hereby grants all motions to intervene.
 
 
 [2]
 In 1968 massive reservoirs of oil were discovered at Prudhoe Bay. Plans to construct the pipeline were announced in 1970. From its beginning the pipeline has been grist for judicial mills. See, e. g., Wilderness Society v. Morton, 156 U.S.App.D.C. 121, 479 F.2d 842 (1975) (en banc); Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), rev'g 161 U.S.App.D.C. 446, 495 F.2d 1026 (1974). Indeed, it literally took an act of Congress to prevent further environmental litigation. Trans-Alaska Pipeline Authorization Act, 43 U.S.C.A. § 1652(d). Construction was thus delayed until 1974 and took three years
 Oil began to enter the pipeline on June 20, 1977. An explosion and fire at pump station No. 8 on July 8, 1977, resulted in a temporary shutdown. The parties have informed the Court that the first oil is expected to reach Valdez around July 26, 1977.
 
 
 [3]
 Each of the following companies owns an undivided interest in TAPS:
 These companies are subject to ICC regulation by virtue of the Interstate Commerce Act, 49 U.S.C.A. § 1(1)(b), which covers common carriers engaged in the transportation of oil by pipeline.
 Company Percentage Ownership
------------------------------ --------------------
Mobil Alaska Pipeline Co. 5.00%
Sohio Pipe Line Co. 33.34%
Arco Pipe Line Co. 21.00%
Exxon Pipeline Co. 20.00%
BP Pipelines Inc. 15.84%
Phillips Alaska Pipeline Corp. 1.66%
Union Alaska Pipeline Co. 1.66%
Amerada Hess Pipeline Corp. 1.50%
 
 
 [4]
 Tariffs must be filed with the ICC pursuant to 49 U.S.C.A. § 6(1)
 
 
 [5]
 Because Phillips, the eighth owner, filed its tariff on June 20, 1977 with an effective date of July 20, the time for filing protests had not expired by June 28, the date of the ICC's order. Phillips' tariff was thus not covered by the Order and is not before this Court
 
 
 [6]
 Alaska owns a one-eighth royalty interest in the oil from the Prudhoe Bay fields. In addition, Alaska has an oil production severance tax. Both the value of the royalty oil and the severance tax are tied to the value of the oil at the point of production, i. e., the wellhead value. Alaska contends that the wellhead value is generally determined by the market price less the transportation costs. Therefore, as the TAPS carrier rates increase, the value of Alaska's interest decreases
 
 
 [7]
 Prior to the enactment of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C.A. §§ 1601-1627, the Inupiat Eskimos held claims of unextinguished aboriginal title to the entire Arctic Slope of the State of Alaska, an area which encompasses Prudhoe Bay and much of the land over which TAPS was constructed. The Arctic Slope Regional Corporation is one of 12 corporations established pursuant to ANCSA to conduct Native Alaskan business for profit. 43 U.S.C.A. § 1606. As compensation for the extinguishment of all aboriginal land claims, ANCSA granted Alaskan Natives fee title to approximately 400 million acres of land. 43 U.S.C.A. §§ 1611, 1613. All future revenues derived from that land will be the property of the Native people. 43 U.S.C.A. § 1606. ANCSA further provided for cash compensation of $962,500,000 to be paid over a period of years, a portion of which is to be derived from a 2% royalty on the wellhead value of all crude oil production in Alaska under state or federal leases. 43 U.S.C.A. §§ 1605, 1608. Thus, on their theory, the Native Alaskans' revenue is inversely related to the rise in TAPS tariffs
 
 
 [8]
 Recognizing the importance of the controversy, the ICC, in an extraordinary move, bypassed its usual procedural channels and took the suspension proceeding for its own direct consideration. While Commission regulations consider a protest and petition to suspend "as addressed to the discretion of the Commission," 49 C.F.R. § 1100.42 (1976), suspension protests and petitions are in practice routinely referred to the Board of Suspension. See 49 C.F.R. § 1100.200 (1976); Mobil Memorandum In Support of Application for Interlocutory and Temporary Restraining Order at 7; Reply of Interstate Commerce Commission in Opposition To Application For Interlocutory Injunction and Temporary Restraining Order at 4. The Commission heard arguments for one full day before issuing its suspension Order
 Although a transcript of that hearing was made, the papers on file with the Court contain only excerpts from that proceeding. E. g., Appendix A to Justice Department's Memorandum in Support of Motion to Dismiss; Appendix C to Memorandum of the State of Alaska in Opposition to Applications for Interlocutory Injunction and Temporary Restraining Order. Also, the tariff filings themselves, with any supporting submissions, were not filed with the Court. On file with the Court, however, were several exhibits such as "Reply of Exxon Pipeline Company to Protests" (Appendices of Exxon Pipeline Company for Expedited Consideration, or in the Alternative, Stay Pending Review) and statements by C. R. Thompson, Controller-Treasurer of Mobil Alaska Pipeline Co. (Appendix D to Memorandum of the State of Alaska in Opposition to Application for Interlocutory Injunction and Temporary Restraining Order).
 8a The briefs of the parties contained references to the information which the ICC apparently had before it during the suspension proceeding. Such information included: (i) written representations in the form of protests from the State of Alaska, the Arctic Slope Regional Corporation, the United States Department of Justice, and the Bureau of Investigations and Enforcement of the ICC (Memorandum of the State of Alaska in Opposition to Applications for Interlocutory Injunction and Temporary Restraining Order at 2); (ii) verified statements offered by the TAPS carriers in support of their rate calculations (Memorandum in Support of Exxon Pipeline Company's Motion for Expedited Consideration or, in the Alternative, for a Stay Pending Review at 46) (hereinafter Exxon Memorandum); (iii) statement of Dr. Michael J. Ileo (submitted with Alaska's protest) which discusses the unreasonableness of carriers' rate calculations (Exxon Memorandum at 46); (iv) sworn testimony of Raymond B. Gary, a Managing Director of Morgan Stanley & Company, and Dr. Ezra Solomon, Dean Witter Professor of Finance at the Graduate School of Business of Stanford University, filed in Ex Parte No. 308, Valuation of Common Carrier Pipelines (Exxon Memorandum at 38); (v) letters sent from Mobil Alaska Company to ICC (obtained under the Freedom of Information Act, 5 U.S.C.A. § 552) which deal with such topics as TAPS start-up, depreciation, dismantling and restoration, anticipated salvage, and estimated annual operating expenses (Memorandum of the State of Alaska in Opposition to Applications for Interlocutory Injunction and Temporary Restraining Order at 25-6); (vi) calculation of the rates of return on valuation for 90 regulated pipelines for the years 1970-72, made by George M. Stafford, former ICC Chairman (Exxon Memorandum at 40-1); and (vii) a variety of carrier-provided data concerning the normal traffic volume for the beginning years of TAPS, costs, depreciation charges, and investment calculations (ICC June 28 Order at 5-7 and Appendices to Order).
 
 
 [9]
 The Order is set forth as an Appendix to this opinion
 
 
 [10]
 49 U.S.C.A. § 15(1) reads in pertinent part as follows:
 "Whenever, after full hearing, upon a complaint made as provided in section 13 of this title, or after full hearing under an order for investigation and hearing made by the Commission on its own initiative, either in extension of any pending complaint or without any complaint whatever, the Commission shall be of opinion that any individual or joint rate, fare, or charge whatsoever demanded, charged, or collected by any common carrier or carriers subject to this chapter for the transportation of persons or property, as defined in section 1 of this title . . . is or will be unjust or unreasonable . . . the Commission is authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare, or charge, or rates, fares, or charges, to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged . . . and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the Commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any rate, fare, or charge for such transportation other than the rate, fare, or charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be . . . ."
 
 
 [11]
 49 U.S.C.A. § 15(7):
 "Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, fare, or charge, or any new individual or joint classification, or any new individual or joint regulation or practice affecting any rate, fare, or charge, the Commission shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice; and pending such hearing and the decision thereon the Commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, charge, classification, regulation, or practice, but not for a longer period than seven months beyond the time when it would otherwise go into effect; and after full hearing, whether completed before or after the rate, fare, charge, classification, regulation, or practice goes into effect, the Commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate, fare, charge, classification, regulation, or practice shall go into effect at the end of such period; but in case of a proposed increased rate or charge for or in respect to the transportation of property, the Commission may by order require the interested carrier or carriers to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a change in a rate, fare, charge, or classification, or in a rule, regulation, or practice, after September 18, 1940, the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable, and the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible. . . ."
 As Filed by Authorized
 TAPS Owners By Order[12] Reduction
*12. According to the ICC, these rates reflect a 10% rate of return on
tentativve valuation. See pp. 4-8 of the ICC Order, and Appendices 2-5
thereto.
 -------------- --------------- -------------
Amerada Hess Pipeline Corp. $6.44 $4.85 $1.59
Arco Pipe line Company 6.04 4.91 1.13
BP Pipelines Inc. 6.35 4.68 1.67
Exxon Pipeline Company 6.27 5.10 1.17
Mobil Alaska Pipeline Company 6.31 4.84 1.47
Phillips Alaska Pipeline Corp. 6.22 Not Yet Acted Upon
Sohio Pipe Line Company 6.16 4.70 1.46
Union Alaska Pipeline Company 6.09 4.89 1.20
 
 
 [13]
 See note 1, supra
 
 
 [14]
 Judge Leventhal in his concurring opinion in Continental Airlines, Inc. v. CAB, 173 U.S.App.D.C. 1, 522 F.2d 107 at 131 (1975) (en banc), emphasized the evasion of judicial review as the key to Moss
 
 
 [15]
 As we noted previously, if the Commission does not complete its investigation within seven months from the date of its suspension Order, the carriers' originally filed rates automatically go into effect
 
 
 [16]
 Under § 15(7) the Commission may require carriers to keep records and make refunds after the seven-month period has expired. This expressly conferred authority is not what we rely upon it relates to "a proposed increased rate or charge."